[Crim. No. 4184. In Bank.—March 2, 1939.]

THE PEOPLE, Respondent, v. CHARLES AUGUSTINE McLACHLAN, Appellant.

George C. Watson and Carl W. Minton for Appellant.

U. S. Webb, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

SEAWELL, J.—This appeal, taken from a judgment imposing the death penalty on appellant, comes to this court by the operation of section 1239, Penal Code, which provides: "When judgment of death is rendered upon any plea, an

appeal is automatically taken without any action of the defendant or his attorney.'' As a result of the above statute the court has been put to the task of reading approximately five hundred typewritten pages of testimony, and proceedings, much of which is repetitious cross-examination, in order to determine whether the defendant suffered prejudicial error during the trial of the cause, notwithstanding the fact that neither the defendant nor his counsel has made any claim or suggestion that the trial was not in all respects fair, nor that the verdict rendered is not fully supported by the evidence.

The defendant entered a plea of not guilty and not guilty by reason of insanity to the indictment and waived a trial by jury as to each of said pleas, and the court found against him as to each.

The indictment accused the defendant with having murdered, in the county of Los Angeles, on or about April 14, 1938, one Jennie Moreno, a girl of the age of six years and nine months, the daughter of Juan and Dominga Moreno, residents of the city of Downey, county of Los Angeles.

The Moreno family is of Mexican origin and consisted of mother, father, and six very young children. The defendant, Charles Augustine McLachlan, aged fifty-five years, is a native of Arizona, and in blood is half American and half Mexican. By trade he was a master painter and decorator. He had resided with his wife and family for fifteen years at Downey in the Mexican community in which the Morenos and most of the witnesses who testified in the case were residents. Said settlement consisted of a number of Mexican families who lived in small houses or huts in a closely settled area. The defendant's wife died some three years prior to the homicide, leaving surviving her, defendant, a married son, and a daughter by a former husband.

The defendant, with his accumulations, had built two or three small houses upon a lot of land which he had purchased before his wife's death. After her death he gave up the most habitable residence to his son and wife and their small child. He lived near by in a building referred to as a shack which possessed few, if any, of the comforts of a home.

After his wife's death he became addicted, at times, to spells of intoxication. He was well known by all his neighbors, some of whom had known him for thirty years, and he was well liked by all. The mother of the dead child, who

had known the defendant for some thirty years, testified that the defendant was a kindly, well-disposed man, and his previous reputation could not be questioned. Several other neighbors testified to the defendant's good reputation. He had been found on one or two occasions, since his wife's death, quite insensibly intoxicated, but no cruel or unnatural act had ever, to their knowledge, been committed by him. At times he had bought the children in the neighborhood candy and small presents at the community store.

On the morning of April 14, 1938, the defendant apparently arose at his customary hour and, as usual, milked his goat. He went to the drive-in store early in the forenoon at the request of his daughter-in-law to purchase some Jello and milk for her young son, who was quite ill. His neighbors did not observe anything unusual about his conduct except as related by the testimony of Mr. James Wood McDonald, an old acquaintance, who resided across the street from the defendant. McDonald first saw him on that day about 9 o'clock A. M. Defendant was cutting weeds in his lot. A little later the defendant called to him from across the street and invited him to come over and join him. He carried a paper bag in which he had a half-gallon jug about half full of wine. McDonald came across the street to talk with the defendant, who offered him a drink of wine and told him he had already had a couple of drinks of whisky. He invited McDonald to walk down the railroad track, which he did, and they had a few drinks of wine. McDonald advised him that drinking wine after drinking whisky would make him very sick. The defendant, however, insisted on taking several drinks of wine and the two walked down the railroad track to where the defendant's step-daughter lived in the Mexican settlement at Downey. The defendant continued drinking the wine and became quite intoxicated. At his step-daughter's home he was placed upon a bench, where he remained for some time. Both the step-daughter and Mr. McDonald testified that the defendant became helplessly intoxicated, and McDonald finally left and did not see the defendant again until the next morning at the sheriff's substation at Norwalk. At the time that McDonald accepted the invitation of the defendant to drink from his demijohn the hour was somewhere near 12 o'clock midday. This was after the child had been killed. McDonald, however, testified that

he was visibly affected with intoxicating liquor before the homicide was committed. Other evidence corroborates him as to this statement.

Mrs. Carmen McLachlan, daughter-in-law of the defendant, and the person for whom the defendant went to the store and purchased Jello and milk for her sick child, testified that Jennie Moreno, the deceased, and her smaller sister, came into her house about 10 o'clock on the morning of April 14th and gave her a magazine which she had been instructed to deliver to Mrs. McLachlan. After that hour Mrs. McLachlan never saw the little girl again. The houses in this vicinity are quite close together, but there are small door-yards in which the children in the neighborhood frequently gathered for play.

Neither the father nor the mother of Jennie saw the defendant at any time during April 14th. The last time either of the parents saw their child alive was at 11 o'clock A. M., April 14th, as she was preparing to attend church. She failed to return at the noon hour, and her mother became anxious as to the child's welfare as the hours grew on. The neighborhood was soon making search and inquiry as to the whereabouts of the missing child. Suspicion began to point its accusatory finger at the defendant some time about 6 o'clock in the evening. Mrs. Virginia Ortega, who lived near by, returned to her home at that hour, and some time thereafter she detected an odor which came from the shack of the defendant. Upon the arrival of the officer about 12 o'clock midnight, an investigation was made and smoldering clothing was discovered burning on a piece of sheet iron in defendant's house. The floor was found to be quite wet in spots. There was no chimney nor flue to draw the smoke away from the interior of his house, and the smoke from the slow smoldering fire was probably carried through the open door and apertures of the small house. This, and other suspicious circumstances, caused the neighbors to notify the sheriff's office at Norwalk. When Officer White reached the scene he observed the defendant in his house with the door partly ajar. He entered and ordered the defendant outside and made an inspection of the interior of the house, which he described as 8 feet by 12 feet and containing a bed and a closet. He observed an old stove in the house, turned upside down, and found, in the corner of the room,

a large piece of sheet metal upon which there was smoldering clothing partially burned. The floor of the house was practically drenched with water. Blood was on the floor under the bed. Officer White kicked the clothing out of the room. It was examined and found to contain pieces of bedding and some of defendant's wearing apparel, which appeared to bear stains of blood. He thereupon put the defendant under arrest. Presently he heard the father of Jennie Moreno scream as the body of the little girl was discovered. He took the defendant, through a hole in the fence, into the vacant lot adjoining his residence and left him in charge of two Mexicans while he went to the spot where the girl's body lay. Quite a group of Mexicans had gathered near the body. While the officer was gone someone had struck the defendant and knocked him to the ground, cutting the skin about his eye. Upon closer examination of the premises the blood-stained shoes of the murdered girl were found in the toilet at the rear of the defendant's shack. A blood-stained hammer, the property of defendant, was also found, and the bed clothing showed that blood-stained pieces had been, cut out of the bed mattress, and also out of the bed clothing, and had been placed in the slow smoldering fire. The mattress was saturated with human blood. Other evidences of the crime were discovered which it is unnecessary here to relate. Chemical analysis showed that the blood stains mentioned herein were stains made by human blood. Officer White testified that the defendant doubtless had been, and was then, under the influence of liquor and he walked with considerable difficulty.

Defendant was taken to the substation at Norwalk where he was afterward interviewed by Sheriff Biscailuz and three other officers. Sheriff Biscailuz admitted that the defendant showed evidence of emerging from a hard drinking spell. However, he thought he understood all that was said and done, and he sought to obtain a confession of the defendant as to the commission of the crime. The defendant, however, stated that he had no memory of any crime being committed, knew nothing about it, and no information was obtained. The sheriff told the defendant that he thought it would be better for him to ease his mind and tell the truth. He also told him that they had all the physical evidence; that they had everything; that there was no doubt in their minds as to who had committed the atrocious murder. He further

testified that he told the defendant that whatever he said should be said voluntarily and without any hope of immunity or reward. The sheriff then told him he would have to leave him for a little while, and after the sheriff had been gone about fifteen minutes the officers who had defendant in charge called up the sheriff and told him the defendant was ready to make a confession. The sheriff said he again told him his confession would have to be voluntary, and, after again laying the foundation for a voluntary confession, he asked the defendant if he was ready to proceed and the defendant advised he was. The confession was received in evidence. It was made several hours after the defendant had been taken into custody. The sheriff, however, testified that the defendant had a ''sort of a hang-over'', but he understood everything said and recognized the sheriff. The defendant, however, had had no sleep or food from the time he was taken into custody to the time the confession was given. The two officers who had the defendant in custody during the absence of the sheriff testified that they confronted him with the facts of the case, and told him of their discovery of the child's shoes in his toilet, and the defendant thereupon said, ''It must be me.'' Thereupon he said that if the sheriff would come he would tell him all.

The defendant has insisted throughout the trial that the officers who had him in custody told him it would be better for him to confess, and if he would they would assist in procuring hospitalization for him as he was then suffering from the beating which he received and doubtless from the effect of excessive use of intoxicating liquor. Whatever strength there may have been in the contention that the confession was not voluntary was nullified by the fact that the defendant took the stand at the trial and made admissions which cannot be regarded otherwise than as a confession of his commission of the crime. The question as to whether or not the confession was properly obtained in the presence of the four officers was a matter within the province of the court to decide, and there being no inherent improbability as to the truth of the testimony given in support of its admission, we would not be justified in reversing the cause on the ground that the confession was not obtained in the manner prescribed by the statute. While it is true that the evidence pointing to the defendant as the person who killed Jennie Moreno is circumstantial, save as to his own admission,

it belongs to that conclusive class of evidence which convinces the mind beyond all reasonable doubt that he and no one else did commit or could have committed the crime. According to his statement, in the forenoon of April 14th he was cutting grass in his yard, and, becoming weary, he went into his shack to lie down for a few moments. While there the little girl entered the opened door and came to his bed where he lay and commenced to play with him in childish amusement. He took her upon the bed and began to fondle her in an improper way. In his treatment of her he caused her pain and she made an outcry or two, whereupon he reached for a hammer near his bed and struck her two death-dealing blows upon the top of the head, crushing her skull and causing her to die instantly. The defendant admits this much. The other gruesome part of the picture is that he tore her flesh from the vagina to the rectum. This he denies. Whether an instrument was used in accomplishing this mutilation, the doctors were unable to determine. After killing her, he placed her on the bed and covered her with the bed covering, where she remained until 9 o'clock at night. He then took her into the vacant adjoining lot, left her remains in quite a heavy growth of weeds, where it was afterward found, as heretofore related. The defendant's bed and bed clothing, mattress, and his personal wearing apparel, as well as the little girl's wearing apparel, were discovered and linked to the crime under such circumstances that there can exist no reasonable doubt of its commission by the defendant. The defense on the grounds of insanity was the only defense not foreclosed by the circumstances of the crime.

Immediately after the case was called for trial, counsel for the defense raised the question of the defendant's present sanity. They represented to the court that the defendant had failed in all ways to cooperate with them, and they were utterly unable to get any assistance from him in the preparation of his defense. They therefore earnestly requested the court to examine into the present sanity of the defendant. The court did not, at any time, express a doubt as to the defendant's sanity (sec. 1368, Pen. Code), but upon the insistence of counsel for the defendant, permitted his attorneys and other witnesses to offer testimony as to his sanity. The testimony given by said attorneys generally was that the defendant was incoherent in speech, and his

mind was a blank, and he had become senile from the heavy use of intoxicating liquor; that he was unable to sleep and his health generally was broken; that he complained of hearing witches talking at all times. They also testified that his keepers had placed him in a padded cell for several days while in confinement.

Dr. Lieuallen, a specialist in nervous and mental diseases, called by the People, testified that he had made a physical examination of the defendant and he found a slight edema or swollen condition of the lower extremities, and the pupil of the left eye was larger than the right. He found no physical evidence of insanity. He said, however, the physical conditions which he mentioned were matters to be taken into consideration in determining mental soundness. When he first saw the defendant he was very distressed, sad, and evidently suffering great psychic pain. He said the defendant's physical condition was fairly good for a man of his age. He observed no illusions or hallucinations. He was of the opinion that the defendant was sane. On cross-examination he admitted that in his written report as to the defendant's health made near the time of examination he stated that he found some evidence of pre-senility and psychic pain. In explanation of his written report he said that insanity may appear in the pre-senile stage of life but "pre-senility did not mean there was insanity". In the instant case he thought the pre-senility was mostly physical; the excessive use of alcohol may have predisposed him to pre-senility; the edematous condition of the lower extremities might indicate the beginning of kidney trouble and the pupil enlargement could be entirely due to alcoholism or arteriosclerosis. On the first examination the doctor had no direct conversation with the defendant. While on the stand the doctor was asked to make an examination forthwith of the defendant. After doing so he reported that his examination had not caused him to change his former opinion. The doctor asked the defendant if he remembered him and he replied, "No." He asked him if he could help him out in any way and the defendant said, "Sure. Sit down." The doctor sat down and asked him if he could help him out in anything and the defendant asked, "When am I going home?" The doctor asked what month it was and he replied, "No, I don't believe I know." He asked him what month

he went to jail and he replied that he did not believe he knew. He asked him how old he was and he replied, "About 35." (His age was 55.) The doctor then added: "But his demeanor, his stimulus of responding, he understood what I said, he was in contact, I believe, with reality." The doctor said he thought he was positively malingering during this present examination. The examinations were some three or four weeks apart. The doctor said he asked him what the witches said but he could not tell him anything definite they said. His answer was: "They say most anything."

The prosecution called Dr. Benjamin Blank, the county jail physician, who testified that the defendant had been under his observation since he was lodged in jail, a period of approximately two months. He testified that it was his opinion that the defendant was feigning insanity. He had recently caused considerable disturbance by climbing the rails of the doors in an attempt to get out, and he was placed in the hospital part of the jail for self-preservation and observation. When first admitted to the jail he did considerable talking and his behavior was more or less normal. About two months later his behavior suddenly changed and he had refused to talk with anyone since. The testimony of all other witnesses is that the defendant was at all times in an apparently dazed and confused state and it was with much difficulty that he could be made to speak. He refused to eat for intervals of five or six days, and it became advisable to force him to eat. After one or two processes he began eating again. The doctor said that there was no evidence that the defendant was suffering from any form of insanity. He further said that the defendant had made a very poor attempt, in his opinion, at malingering, but the time may come when, if he continues to worry the way he does at the present time, "this depressing mood he is in may later develop into a condition where he will become insane, that is possible on account of his grief".

This matter being submitted to the court it made an order finding the defendant to be presently sane.

There seems to be some difference between counsel as to whether the proceeding was brought under section 1368 to determine the present sanity of the defendant, or whether the proceeding was instituted not because the court entertained any doubt as to defendant's sanity, or requested the inquiry to be made, but because the defense was desirous of

presenting evidence which would create in the court's mind such doubt as would cause it to proceed under said section 1368, Penal Code. The request being denied, counsel proceeded to the trial of the main issue as though the proceeding as to the present sanity of the defendant had not been brought to the court's attention. Be this as it may, counsel treated the entire matter as determinative of the defendant's sanity and were thereby estopped from making any question as to the regularity of a proceeding wholly instituted and directed by themselves. Moreover, the proceeding was in conformity with section 1368, Penal Code.

 Several psychiatrists called by the prosecution testified that in their view the defendant was responsible, under the law's test, for the commission of an offense which from every viewpoint shocks human sensibilities. Whether he committed the crime unconscious of what he was doing and afterwards was awakened to a state of realization of the horror of his act, and therefore suffered psychic pain (defined as a depressing state of remorse occasioned by an accusing conscience), is a question to which few psychiatrists, if any, may be able to give a satisfactory answer. We have before us the fact that the defendant committed the homicide beyond any reasonable doubt and that he concealed the body until nightfall, and with some cunning removed it from his house to an adjoining unoccupied lot. This, at least, is some evidence that he knew the nature and the quality of the act he had committed, and knew that it was wrong and contrary to law to commit it. The burden was upon the defendant to show by a preponderance of evidence that he was excusable under well-settled rules of law for the commission of his criminal act. This was not done. It therefore becomes the duty of this court to affirm the judgment and such other orders as are deemed appealed from under the provisions of section 1239, Penal Code. Judgment and orders appealed from are accordingly affirmed.

Shenk, J., Curtis, J., Langdon, J., Edmonds, J., Houser, J., and Waste, C. J., concurred.