[Crim. No. 629. Fourth Dist. Dec. 1, 1944.]

THE PEOPLE, Respondent, v. RAYMOND L. COX, Appellant.

Swing & Swing for Appellant.

Robert W. Kenny, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendant was convicted of the murder of Charles C. Clauson under count one of the information and his sentence fixed as second degree murder, and of assault with a deadly weapon of one Lee Clauson under count two thereof. The deceased, Charles C. Clauson, was a barber and had been acquainted with the defendant who operated a bar and café in San Bernardino for many years. Lee Clauson, 30 years of age, was a son of deceased. On the evening of March 4, 1944, at about 11:45 o'clock, after returning from some wrestling matches, the Clausons and Jack Houser went to

defendant's place of business, which was closed. They knocked on the door and defendant opened it. Charles asked if they could buy a drink. After some discussion, defendant let the men into the café and seated them in the rear room. A bar with several stalls occupied the space near the east wall. Three or four booths occupied the space near the west wall. Defendant poured four drinks for the guests. Tom Basham, who was in the barroom when the men entered, joined them. A Mrs. Koke, who worked there as a waitress, was near the bar. Defendant, as well as the guests, had had several drinks during that evening. After the round of drinks had been consumed, defendant asked who was going to pay for them. Some discussion ensued as to the amount due and who was to pay it. The testimony relating to subsequent events leading up to the homicide is somewhat conflicting.

▋ Houser testified generally that when the defendant asked them for $2.40 for the drinks he offered to give a check for the amount; that deceased said: "I will take care of it"; that Lee said he would pay for their drinks but for nobody else's; that defendant took a swing at Lee and hit him in the face with his fist; that Lee then hit defendant with his fist and that they both fell to the floor with Lee on top; that he (Houser) walked out of the back room to the front end of the bar where he and Basham stood; that Lee came out of the back room and said to him: "Let's go"; that Mrs. Koke opened the door for them; that after they got outside Basham came running out and grabbed Lee; that Lee said to Basham: "Get back in there or I will knock your —— —— head off"; that while he was walking east on Third Street several feet from the entrance to the café, he heard three shots fired; that he later went back and found Lee lying on the sidewalk about eight feet from the front door near the curb; that the deceased was lying on the sidewalk about four feet from the building; that he did not see the defendant.

Lee Clauson was unable to appear as a witness at the trial due to his physical injuries. His testimony given at the preliminary examination was, by stipulation, read into the evidence. He there testified in effect that defendant invited them into the café and said: "Have one on me"; that when defendant asked for the money for the drinks he told him that he wasn't going to be invited into a place to have a drink on the house and then have to pay for everybody's drink; that Charles offered to pay tomorrow; that defendant got mad and took a swing at Charles and missed him; that he (Lee)

stepped up to separate them and defendant hit him; that he hit defendant two or three times and they fell to the floor and a scuffle ensued; that he reached in and took out a bottle of whiskey from one of the cases around the room and threatened to hit defendant; that he did not hit him but he thought he heard a bottle break; that he got up, took the bottle with him, and walked out the front door with Basham following him; that he there waited for his father; that as Basham approached him Basham assumed a fighting position and he threatened Basham with the bottle unless he stepped back into the café; that his father stepped out about that time; that the door opened again and defendant appeared with a gun; that as he looked toward the door he saw flashes from the gun and he was hit; that he heard five or six shots fired and saw his father go down; that after defendant stopped shooting, the door closed.

Basham testified that Lee said he wouldn't pay anything for the drinks and shoved defendant back into the corner among some boxes; that Lee grabbed two whiskey bottles; that Lee had defendant down on the floor, hitting him over the head with a bottle; that he left and went into another room for seven or eight minutes and later ran out of the front door and nearly ran into the Clausons who were on the sidewalk; that Lee threatened him with the bottle; that he ran back into the café and shortly thereafter heard two or three shots fired and that he didn't see any broken glass there but did see the Clausons lying on the sidewalk.

Mrs. Koke testified that she heard blows being struck and she ran to the storeroom and saw defendant on the floor with his head against some cases; that Lee was on top of him; that she said to Lee: "You are killing him"; that Charles was standing there watching him and he got a bottle out of the case and held it over his son's head and said: "Quit hitting him you —— or I will murder you"; that Lee got up and went to the front door; that the others followed; that a few minutes later Charles came out; that defendant was just a step behind him; that defendant staggered up and fell against the door-jam; that she heard someone say: "Get back in there you —— ——"; that she heard a blow, the breaking of glass, and then some shots; that it all followed so closely together that there was no noticeable time intervening; that after defendant fired the shots he went over to the front end of the bar and leaned against it; that he was unsteady on his feet; that she put her arms around his body and helped him

back to the storeroom where he stood while she got some water and washed the blood from his face and removed his blood-stained shirt; that defendant secured a dustpan and said: "Let's clean up and go home."

Defendant testified that when he suggested that the price of the drinks was $2.40 Lee said: "Don't give him a —— —— cent"; that deceased said: "All I got to do is to say one word, we start fighting, we never lose, somebody gets hurt and hurt bad"; that deceased hit him in the mouth and knocked out his upper plate; that Lee hit him in the temple and grabbed a bottle and knocked him down with it; that blood began to run from his nose and face; that he asked Lee not to hit him any more; that right then another bottle broke over his head; that that was the last he remembered for some time; that when he "came to" he was lying on the floor and when he started to get up he saw deceased standing about four feet from him with a bottle in his hand reaching into a coke case nearby; that when he got up deceased had gone to the main bar; that he followed him and told him to put the bottles down and get out; that deceased turned and threw the large bottle at him and hit him in the stomach; that he figured he had to have his gun for protection; that he went and got his revolver which was kept on the shelf in the kitchen at the rear of the café; that he returned to the bar and that deceased was still standing there sideways with two coke bottles in his hands looking back towards the kitchen; that deceased walked toward the front door looking over his shoulder and watching him; that he followed him; that when deceased went out the front door he was right behind him; that he (defendant) "kind of stood up against the side of the door and leaned against it"; that deceased was standing about four feet out in front; that he heard someone say: "Get your head back in there, you —— —— or I will knock it off"; that he stuck his head out to see who it was and deceased instantly hit him with one of the coke bottles; that he was struck in the head and this was the last he remembered until he came to in the county hospital; that he did not recall discharging the revolver and didn't remember what he did with it afterwards.

A photograph of defendant in evidence clearly shows a serious head injury had been inflicted. Medical testimony was introduced showing that defendant had four cuts on his forehead, evidence of bleeding from the right ear, and superficial bruises on his abdomen; that it seemed as though defendant

had a brain injury and an opinion was expressed that defendant had a loss of memory or traumatic amnesia caused by a blow on the head, and that defendant, at the time of trial, was still suffering therefrom. Without relating it in detail, there was other testimony of police officers as to the conduct of defendant at the time the arrest was made which might support a conclusion that defendant was or that he was not suffering from traumatic amnesia at the time. We will consider this matter at another time.

Since defendant questions the sufficiency of the evidence to support the verdict, we shall discuss this subject before answering the other legal points presented.

It is argued that the evidence fails to show malice, either express or implied. Viewing the evidence in a light most favorable to the People, the jury was justified in believing that there was a deliberate intention on the part of the defendant to unlawfully take the life of the deceased. Malice is express when there is manifested a deliberate intention to take the life of a fellow creature. (*People* v. *Greig,* 14 Cal.2d 548, 561 [95 P.2d 936]; Pen. Code, § 188.) Viewing the evidence in a light most favorable to the prosecution, there is no question that it would support a conviction of murder in the second degree. (*People* v. *Reese,* 65 Cal.App.2d 329 [150 P.2d 571].)

 Defendant offered a group of instructions, which included not only the theory of self-defense but other defensive theories, which proffered instructions were refused by the trial court. Two of these bore upon the right to an instruction or instructions based upon section 26, subdivision 5 of the Penal Code, which is to the effect that a person is incapable of committing a crime when he is not conscious thereof. It has been repeatedly held in this state that unconsciousness produced by voluntary intoxication does not render a defendant incapable of committing a crime. (*People* v. *Taylor,* 31 Cal.App.2d 723 [88 P.2d 942]; *People* v. *Sameniego,* 118 Cal.App. 165 [4 P.2d 809, 5 P.2d 653].) The People argued throughout the trial that in view of the fact that defendant entered only a plea of not guilty of the offenses charged in the information that the defendant was therefore conclusively presumed to have been sane at the time of their commission and that he was therefore precluded from offering evidence on the question of his unconscious condition at the time, and that the court's refusal to give any instruction on that sub-

ject was justifiable. We are convinced that this is where the trial court fell into error. Counsel for defendant does not now, nor did he during the trial, contend that defendant was insane. In fact, he stated that he was sane but suffering from amnesia. It is likewise not contended here that defendant was unconscious from voluntary intoxication but was unconscious from a blow on the head inflicted by his assailant, which blow created traumatic amnesia or automatism, and that while in such unconscious condition he committed an act without being conscious thereof.

In *People* v. *Freeman,* 61 Cal.App.2d 110 [142 P.2d 435], on a charge of violating section 500 of the Vehicle Code (negligent homicide) where there was a conflict in the evidence as to whether the driver of the car was under the influence of intoxicating liquor at the time of the accident, or whether his condition was the result of an attack of epilepsy, the court, in discussing the issues there involved, held that it was not incumbent on defendant to plead insanity in order to prove his unconsciousness at the time of the accident. The attorney general in that case contended that in order for the defendant to prove his unconsciousness at the time of the accident it was incumbent upon him to plead insanity. It was there directly stated that such is not the law, citing cases. It was also held that the jury should have been instructed in direct and clear language that defendant should be found not guilty if the collision occurred while he was not conscious of his acts because of an attack of epilepsy. It must be said here as it was said in *People* v. *Sameniego, supra,* at page 173:

"Where there is evidence of the existence of that state of the mind wherein the individual's conscious mind has ceased to operate and his actions are controlled by the subconscious or subjective mind it would be error to refuse instructions as to the legal effect of such unconsciousness. This leads to the query as to whether any such evidence exists in this case."

In addition to defendant's testimony that he did not remember anything after he was struck on the head at the door just before the shots were fired and the evidence already set forth, several police officers testified that when defendant was taken to the police station and while talking, he, the defendant, fell off of the chair unconscious; that a doctor examined him and sent him to the hospital; that he was suffering from a head injury and remained unconscious for some time; that there was nothing about the way he walked that indicated that he was

intoxicated. There was ample evidence to support defendant's claimed defense under section 26, subdivision 5 of the Penal Code.

In this connection, defendant produced a specialist in psychiatry and neurology who was on the staff at the county hospital and attended defendant from March 4th until the time of trial. He testified that he examined defendant thoroughly at the jail, observed the wound over his right forehead and that there were several wounds on the left forehead; that defendant complained of pain in his abdomen; that he "appeared rather sheepish and sluggish in action"; and that he then and subsequently made a mental and physical examination of him.

■ The trial court sustained all objections to further proposed questions by counsel for the defendant bearing on this subject of amnesia on the mistaken theory that that issue could only be raised where the defendant had entered a plea of not guilty by reason of insanity. An offer of proof was made that the witness would testify that from the time the blow was inflicted on defendant's head, in his opinion, defendant was suffering from traumatic amnesia and had no recollection of what acts he did during that period. Under the cases cited, the court's refusal to accept such evidence was clearly error.

■ Thereafter, the trial court refused defendant's instructions bearing upon this claimed defense. Defendant was entitled to a proper instruction based upon section 26, subdivision 5 of the Penal Code and the court's refusal to instruct thereon was prejudicial error. (*People* v. *Freeman, supra.*)

■ Defendant next complains of certain instructions offered by the People and given by the court on the law of self-defense. People's instruction No. 10, involving the question as to who was the aggressor, reads in part as follows:

"If the jury believe . . . that the defendant . . . at the time and place alleged in the information, was assailed by Charles C. Clauson and Lee Clauson, in the first instance"; that the Clausons "in good faith withdrew from the combat and left the scene of the encounter; . . . that the defendant, after the withdrawal of the said" Clausons "from combat, if you believe they did so withdraw, pursued the said Charles C. Clauson and the said Lee Clauson with a loaded pistol in his hand, then and in that event you are instructed that the defendant became the aggressor; and if the jury should further

believe . . . that the defendant, while so pursuing the said'' Clausons ''shot off and discharged said pistol at and towards the said'' Clausons ''and thereby killed the said Charles C. Clauson and wounded the said Lee Clauson, then you will find the defendant guilty as charged. . . .''

The instruction in itself is not complete. It does not take into consideration all of the evidence and surrounding circumstances here involved in defining who the aggressor was. It omits several elements pertaining to the law of self-defense and the claim of traumatic amnesia. It also ignores the question whether the act in discharging the revolver was or was not intentional. The acts which a defendant may do and justify under the plea of self-defense depend primarily upon his own conduct, and secondly upon the conduct of the deceased. There is really no fixed rule applicable to every case, although there are certain well-established principles of law which may be defined as a guide for the determination of the deportment of the parties and the actions of men for the guidance of the jury. (*People* v. *Hubbard,* 64 Cal.App. 27 [220 P. 315] ; *People* v. *Freeman, supra.*) Defendant was entitled to a full and proper instruction on the subject. Having inadequately and erroneously defined an agressor under all the circumstances of this case in instruction No. 10, the other instructions using the word ''aggressor'' may have likewise conveyed to the jury an erroneous impression or statement of the law. The attorney general, on appeal, has fairly stated that the failure to give the instruction based on section 26, subdivision 5, was error, but contends that under section 4½, article VI of the Constitution, the judgment should not be reversed. We are fully convinced that the errors complained of were prejudicial and of such a character that a new trial should be ordered. (*People* v. *Reese, supra.*)

Many other errors are urged. Inasmuch as the judgment and order must be reversed and a new trial ordered for reasons expressed, we will not discuss other claimed errors or the objections made to the many other instructions given and refused. No doubt proper instructions on the issues presented will be given on a new trial.

Judgment and order reversed and a new trial ordered.

Barnard, P. J., and Marks, J., concurred.