[Crim. No. 4898. In Bank. Nov. 1, 1948.]

THE PEOPLE, Respondent, v. LOIS HUNT HARDY, Appellant.

Lynne Kelly for Appellant.

Fred N. Howser, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

GIBSON, C. J.—Lois and Joe Hardy, her husband, were charged by information with the murder of James W. McLain. While they were awaiting trial Joe escaped from jail, and Lois was tried alone on her plea of not guilty. The jury returned a verdict of murder in the first degree without recommendation. Defendant's plea of not guilty by reason of insanity was withdrawn, her motion for a new trial was denied, and the death penalty was imposed. This appeal is automatic under section 1239(b) of the Penal Code.

The prosecution's case against defendant rests almost entirely upon oral statements made by her to different persons at different times after her arrest. These statements were in many respects contradictory, and some of them were apparently made by defendant in an effort to shield and protect her husband, who confessed to killing McLain and who is now serving a life sentence for the crime.

In the latter part of July, 1947, defendant and Joe, who were then unmarried, were hitchhiking from Salt Lake City

to Reno. They were given a ride by McLain and the three spent the night in a cabin near Sparks, Nevada. The record is uncertain as to the date, but it appears probable that they arrived at Sparks on the evening of July 28 or 29. Defendant's statements as to what occurred on that night are fairly consistent. She said Joe left the cabin to get some beer, and that in his absence McLain assaulted her. He unbuttoned his pants and tried to push her down on a bed; she fought with him and after a struggle managed to escape. Defendant claims that as a result of the shock she sustained in the encounter with McLain, she suffered a loss of memory and consciousness, and that she has only a vague mental picture of what happened after she was attacked by McLain until she was involved in an automobile accident, which the record shows occurred near Las Vegas on July 31.

Defendant and Joe arrived in Las Vegas alone in McLain's car on the morning of July 31, and they were married there sometime during the day, but defendant claims she has only a hazy remembrance of the ceremony. They were arrested following the automobile accident because they were unable to make a satisfactory explanation of their possession of McLain's car. The police, acting on information given them by Joe while he was in jail, caused a search to be made for McLain's body, and it was found on August 4, near Hirshdale, California, which is approximately 30 miles from Sparks. He had been shot three times in the head and the condition of his body indicated that he had been dead about four days. Two cartridges were found at the scene of the crime, and there was evidence that they were fired from an automatic pistol which Joe had in his possession when taken into custody.

The statements made by defendant as to what she remembered about what happened during the period intervening between the night spent at Sparks and her arrest in Las Vegas are conflicting. One of these statements, which assertedly represents Joe's version of what occurred, contradicts defendant's claim of amnesia and lack of consciousness. It was made to Mrs. Dolley, a police matron, while defendant was in jail at Truckee, California, at the time of her preliminary hearing.

Mrs. Dolley testified that at the request of the sheriff she asked defendant what use was made of a handkerchief wrapped around a stick which was found near the place where McLain was killed. Defendant said that she did not remember anything about a handkerchief, but that she would

tell what occurred, and it might recall the handkerchief to her mind. Defendant then told Mrs. Dolley that she was sitting on a blanket holding McLain's head in her hands, that Joe walked up from behind, and that when she nodded to Joe he shot McLain. She said blood was coming out of McLain's mouth and it made her sick and she reached up and took a handkerchief out of Joe's pocket and put it in McLain's mouth to stop the flow of blood. Defendant asked Mrs. Dolley if she noticed any lipstick on McLain's face, and Mrs. Dolley replied that the body was in such a condition that it could not be determined whether there was any lipstick. Defendant then said, ''There was lipstick on it; it was mine.''

Defendant admitted having had the conversation which Mrs. Dolley related on the witness stand, but explained that, except for the part about the handkerchief, it was Joe's version of what had occurred. She said that shortly after she was arrested in Las Vegas she asked Joe what they were doing in jail. He replied, ''Don't you remember,'' and she said that she had only a hazy recollection of what had happened after she had been attacked by McLain in the cabin at Sparks, Nevada. Joe then told her that he had killed McLain and that she must repeat his story of what occurred, word for word, and not tell the police that she did not remember. She said that when questioned by Mrs. Dolley she did not know what to say about a handkerchief because Joe had not mentioned it, and that, while she was repeating to Mrs. Dolley what Joe had told her to say, she made up the part about the handkerchief. Her statement that this part of the story was invented by her finds support in the testimony of the coroner, who said that the wounds McLain received could not have caused bleeding from the mouth.

Another account of the killing of McLain was given by defendant to Dr. Catton, an alienist appointed by the court to examine her. Dr. Catton testified that she told him that after she had been attacked by McLain in the cabin the next thing she remembered she ''was somewhere in the woods.'' She said ''It seems I was falling down into darkness, I was horrified; it seems I got the gun which was tucked in my skirt and I shot him. I knew I shot him once.'' Dr. Catton asked her how she knew it was McLain, and she answered, ''Because he was kissing me. . . .'' She told Dr. Catton she first remembered shooting McLain when Joe told her about the killing.

The story which defendant told on the witness stand concerning what occurred following the night at Sparks, is similar

to that which Dr. Catton said she told him. She testified, "After that, I don't remember what happened until,——this might be just a dream or nightmare of what happened in the cabin but it seems as though the next day I was out in the woods with a man, and he was pushing me down, and I was fighting with him. He kept on pushing, and it is all blank again until at night, it was awful dark, and I was in a car with Joe and he told me to reach in the dashboard and take out all of the papers, which I did, and he told me to throw them out the window, and I did that.''

The sheriff of Nevada County, California, accompanied by the coroner, went to Las Vegas to take custody of the defendant and Joe and brought them back by automobile. The coroner testified that on the return trip defendant pointed out a place just off the highway and said they were going to shoot McLain down there but decided it was too close to the highway. The sheriff testified that the place was pointed out by Joe who made such a statement but that he did not hear the defendant say anything.

In testifying concerning defendant's claim of amnesia and unconsciousness, Dr. Catton stated that defendant was undernourished, neurotic, and of "low nervous reserve," and that she was under the influence of Joe whom he described as having a more powerful character. In his opinion she had been prevailed upon by Joe to pretend amnesia and to tell the various stories as to the manner in which McLain was killed. He said that he believed defendant had an independent recollection of what occurred and that she was not telling the truth because she wanted to protect Joe, rather than to do what she could to help herself. He stated, however, that the attack made on defendant by McLain in the cabin at Sparks could have caused both amnesia and automatism, and that if he was wrong in believing that Joe had put the amnesia story in defendant's mind, then his opinion "should be thrown out." Dr. Catton explained that "amnesia" is a word aimed at the memory of a transaction, while consciousness is the process of being aware of things around one, and stated that the term "automatism" is given to such activity as a person might engage in without being conscious thereof.

The foregoing statement of facts has been culled from a lengthy and confusing record, and it has been very difficult to segregate relevant from irrelevant evidence and to determine what portions of the evidence were stricken and what remained for consideration by the jury. There are frequent

references in the record to statements and confessions made by defendant and Joe, to correspondence between them, and to reports made by Dr. Catton, none of which was in evidence and most of which were never offered in evidence. This unfortunate and confusing state of the record is a matter which has an important bearing in determining the prejudicial effect of the errors which occurred at the trial, since it appears that even the attorneys were not certain of what facts had been admitted in evidence, and the closing arguments of both counsel contain inadvertent references to matters which had been stricken or were never presented to the jury. Under the circumstances it is not unreasonable to assume that the jurors may likewise have been confused as to what evidence had been admitted, and that the references to facts not in evidence may have misled the jury into believing that at least some of those facts were to be considered by them in reaching their verdict.

The People claim that there was sufficient proof to support a conviction of murder in the first degree on either of two theories, namely, that the killing was done in the perpetration of a robbery or that it was wilful, deliberate and premeditated.

As to the first theory, there is evidence that defendant and Joe destroyed papers showing McLain's ownership of the car and that they made untruthful statements explaining their possession of the automobile after McLain's death. The facts indicate that there was an unlawful taking, and the evidence would support a finding of either robbery or theft, but these crimes are not synonymous. A determination to steal McLain's automobile, formed after the killing, would be insufficient to justify a conviction on the theory that the murder was committed in the perpetration of a robbery, and it is clear that the case was not tried upon this theory. No definition of robbery was given, and the only instruction which can be said to relate to this theory was given in the language of section 189 of the Penal Code.* Under the circumstances the record will not support a conviction based on the theory that defendant was guilty of murder committed in the perpetration of a robbery.

---

*Section 189 of the Penal Code reads: "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree; and all other kinds of murders are of the second degree."

■ In support of the claim that the killing was wilful, deliberate and premeditated, the prosecution relies on the coroner's testimony that defendant said that she and Joe planned to kill McLain some time before the actual killing, and on defendant's statement to Mrs. Dolley that she gave a signal when Joe was to shoot McLain. This evidence shows premeditation and is sufficient to support a conviction on this theory. ■ A defendant may be convicted upon his own confessions or admissions where, as here, the corpus delicti is independently proved. (*People* v. *Ruef*, 57 Cal.App. 230, 233 [206 P. 775]; see *People* v. *McMonigle*, 29 Cal.2d 730, 738 [177 P.2d 745].) However, in considering the prejudicial effect of the errors to be discussed later, it is important to note that there are weaknesses and inconsistencies in this evidence, as shown by the foregoing statement of facts.

One claim of error relates to the testimony of Kennedy, a deputy sheriff, concerning an asserted oral confession made by defendant. Several written statements signed by Joe and defendant, which implicated them in the crime, were offered by the prosecution and were refused admission because the court found from an examination of the language used that the statements were not made by defendant. One of these statements was predicated on a conversation which Kennedy and another deputy had with defendant and Joe, and the prosecution sought to introduce the substance of the written statement through the witness Kennedy on the theory that the remarks made by defendant were only admissions. After objection that the conversation would not be admissible without a proper foundation if it constituted a confession, the court directed the jury to retire while the nature of the conversation was ascertained.

In the absence of the jury, Kennedy testified as follows: ''They [Joe and defendant] had been talking but they started over and told it from the beginning. They were telling the story as to how they met McLain, how they had enticed him off to the side of the road, how she was holding him in her arms, kissing him while he shot him in the head, and after he fell over he shot him twice more. She felt his pulse and he was still breathing and then he hit him over the head with a rock. He said then that they went to Sparks and cleared out the auto court and then they went to Las Vegas and were married and then they left Las Vegas and wrecked the car and were arrested by the officer.''

Over defendant's objection, the court ruled that this testimony did not constitute a confession by defendant and was admissible. The jury was then recalled and the witness was asked to relate the conversation. Defendant's objections were restated, and the court was requested to direct the witness to designate by whom each statement was made and to give the exact words of the person as near as he could. The request was denied, the objections were overruled, and the witness attempted to state the conversation. When it developed that the witness was making material departures from the testimony given in the absence of the jury, the court, over defendant's objection, directed the reporter to read the testimony as previously given by the witness.

On the day after this testimony was read to the jury, defendant moved to strike it from the record, upon the grounds that it could not be determined which statements had been made by Joe and which by defendant, and that the conversation as related by the witness amounted to a confession for which no foundation had been laid. The trial court properly granted the motion. However, in an effort to distinguish between the part to be stricken and certain other testimony given by Kennedy, the court again read the testimony quoted above and then instructed the jury that it was expunged from the record and that the jurors should entirely disregard it in their deliberations.

Defendant urges that the action of the court was prejudicial because the testimony was read to the jury on two different occasions, and the jurors could not possibly have erased it from their minds. Under ordinary circumstances the trial court is permitted to correct an error in admitting improper evidence by ordering it stricken from the record and admonishing the jury to disregard it, and the jury is presumed to obey the instruction. (*People* v. *Prather,* 134 Cal. 436, 439 [66 P. 589, 863]; *People* v. *Sourisseau,* 62 Cal.App. 2d 917, 929 [145 P.2d 916].) However, as was stated in *People* v. *McKelvey,* 85 Cal.App. 769, at page 771 [260 P. 397], ''It has also been held that in certain cases where the incompetent evidence goes to the main issue and where the proof of defendant's guilt is not clear and convincing, that the error in admitting the incompetent evidence cannot be cured by striking out and instructing the jury to disregard that evidence.'' In that case five witnesses were permitted to testify to defendant's bad moral character, although he had not put his character in issue. Despite the fact that

the testimony was subsequently stricken, the conviction was reversed because "it was an intellectual impossibility for the jury to wholly erase such testimony from their memory and to disregard it as though they had never heard it." (P. 771.) In the instant case, the Kennedy testimony went to the main issue, and it was unduly emphasized by the manner in which it was presented to the jury. Under the circumstances it was extremely unlikely that the jury could wholly reject the evidence and completely disregard it in their deliberations. The prejudicial effect of the error was lessened, however, by the fact that parts of the story related by Kennedy were before the jury through the testimony of other witnesses. (See *People* v. *Sourisseau,* 62 Cal.App.2d 917, 929 [145 P.2d 916].)

The court also erred in giving certain instructions and in refusing to give others. The jury was instructed "that in determining the intention of the defendant at the time of the transaction complained of, it is important to consider the means used to accomplish the killing. The intent or intention is manifested by the circumstances connected with the offense and the sound mind and discretion of the accused. All persons are of sound mind who are neither idiots nor lunatics nor affected with insanity." The identical instruction was criticized in *People* v. *Peterson,* 29 Cal.2d 69, 77-78 [173 P.2d 11], because "It assumes that defendant killed deceased." The court held, however, that since the case was not a close one on the facts, the error did not require a reversal. The same result might be reached here if this were the only error and the case against defendant were clear and convincing as to all of the essential elements of the crime of which she was convicted.

As part of the same instruction, the jury were told that if they were satisfied "beyond a reasonable doubt that the defendant did assail, on the date mentioned, James W. McLain, violently with a dangerous weapon likely to kill, and which did in fact, destroy the life of said James W. McLain, the natural presumption is that such assailant intended death or great bodily harm, and in the absence of evidence to the contrary this presumption must prevail." There is evidence in the record that McLain was killed by defendant instead of by Joe, and the People contend that it is sufficient to support the instruction on the theory that defendant was the assailant. Defendant points out, however, that if this be true the court erred in refusing her requested instructions

on the law of self-defense. Defendant testified that she had a nightmarish memory of fighting in the woods with a man who was "pushing me down." According to Dr. Catton, she told him "The next thing I knew I was somewhere in the woods. It seems I was falling down in the darkness, I was horrified; it seems I got the gun which was tucked in my skirt and I shot him. I knew I shot him once." Defendant also intimated in a letter which Dr. Catton read in the course of his testimony that it was she who killed McLain, and the district attorney in his argument to the jury read from another letter assertedly written by defendant to Joe, in which she said "You and I know I killed that man." These letters were apparently mentioned in Dr. Catton's report, but neither the report nor the letters were in evidence. However, they were treated as being in evidence by the attorneys and were before the jury for consideration with the instruction based on the hypothesis that defendant was the assailant.

Assuming that the evidence was sufficient to justify the instruction which was given on the theory that defendant was an assailant, it would seem clear that defendant is correct in her contention that she was entitled to the requested instructions based upon the theory that, if she shot McLain, she shot him in defense of her person.

█ The defendant was further deprived of the full benefit of her testimony by the giving of the following instruction: "When the evidence shows that a defendant acted as if he was conscious, the law presumes that he then was conscious. This presumption is disputable, but is controlling on the question of consciousness until overcome by a preponderance of the evidence, which means such evidence as when weighed against the presumption, and any evidence supporting the presumption has more convincing force, and from which it results that the greater probability of truth lies therein."

There is no *statutory* presumption that a man is conscious merely because he acted as if he were conscious. (See Code Civ. Proc. §§ 1959, 1961, 1962 and 1963.) Such a presumption, however, appears to have been recognized by judicial decision. (See *People* v. *Nihell,* 144 Cal. 200, 202 [77 P. 916].) But there can be no justification in the law for placing on the defendant the burden of overcoming the presumption "by a preponderance of the evidence." █ It is a cardinal rule in criminal cases that the burden rests on the prosecution to prove the offense beyond a reasonable

doubt (see Pen. Code, § 1096), and it is error to deprive an accused of the benefit of the doctrine of reasonable doubt by giving an instruction that he has the burden of proving a defense by a preponderance of the evidence. (*People* v. *Thomas,* 25 Cal.2d 880, 896-897 [156 P.2d 7] [mitigating circumstances]; *People* v. *Costello,* 21 Cal.2d 760, 763 [135 P.2d 164] [alibi]; *People* v. *Marshall,* 59 Cal. 386, 389 [intent to marry as defense to charge of taking minor female for purposes of prostitution]; *People* v. *Agnew,* 16 Cal.2d 655, 664-666 [107 P.2d 601] [lawfulness of arrest as defense to false imprisonment]; *People* v. *Roe,* 189 Cal. 548, 560-561 [209 P. 560] [defense of another's person].) The necessary effect of the instruction given in the present case was to place on defendant not merely the burden of producing evidence which would raise a reasonable doubt as to her consciousness, but the much greater burden of proving unconsciousness by a preponderance of the evidence.

The mere fact that there is a presumption which tends to support the prosecution's case does not change the amount or quantum of proof which the defendant must produce. (*People* v. *Agnew,* 16 Cal.2d 655 [107 P.2d 601].) The prosecution is required to prove the offense beyond a reasonable doubt and, in so doing, may rely on any applicable presumptions. The defendant, on the other hand, is not required to prove his innocence by a preponderance of the evidence, but only to produce sufficient evidence to raise a reasonable doubt in the minds of the jury. The rule is the same whether the People rely on testimonial evidence or on presumptions, except where the presumption is conclusive.

One of the factors in raising a disputable presumption, such as the one involved here, is that the matter relates to defendant personally and lies peculiarly within his knowledge, and hence for reasons of convenience and necessity he should have the burden of producing evidence thereon. This burden, however, involves merely the duty of going forward with the evidence and of raising a reasonable doubt, and not the duty to overcome the presumption by a preponderance of the evidence. (See *People* v. *Agnew,* 16 Cal.2d 655, 663-666 [107 P.2d 601].) In *People* v. *Nihell,* 144 Cal. 200 [77 P. 916], where defendant claimed he was unconscious by reason of epilepsy, it was held that the burden was on him to establish the peculiar mental condition upon which he relied, and the court stated at page 202: "Men are presumed to be conscious when they act as if they were conscious; and if they would

have the jury know that things are not what they seem, they must impart that knowledge by affirmative proof.'' This is merely another way of saying that defendant has the duty of going forward with the evidence, and it is entirely consistent with the rule that defendant has only the burden of producing evidence which would raise a reasonable doubt in the minds of the jury.

The general rule as to the quantum of proof required of a defendant applies even where a statute places on defendant the burden of proving certain facts. Section 1105 of the Penal Code provides that once a defendant's commission of a homicide has been proved, he has the ''burden of proving circumstances of mitigation.'' As stated in *People* v. *Thomas,* 25 Cal.2d 880, 896 [156 P.2d 7], this ''section in reality merely declares a rule of procedure and does not relieve the state of the burden of proving each and every essential element of guilt beyond a reasonable doubt,'' and it is well settled that it is error to instruct the jury that defendant has the burden of proving mitigating circumstances by a preponderance of the evidence. (*People* v. *Thomas, supra,* at pp. 896-897; *People* v. *Post,* 208 Cal. 433, 437-439 [281 P. 618]; *People* v. *Roe,* 189 Cal. 548, 564-565 [209 P. 560].)

There are statements in a number of cases to the effect that in a separate trial on the issue of sanity the defendant has the burden of proving insanity by a preponderance of the evidence. (*People* v. *McLachlan,* 13 Cal.2d 45, 55 [87 P.2d 825]; *People* v. *French,* 12 Cal.2d 720, 734 [87 P.2d 1014]; *People* v. *Troche,* 206 Cal. 35, 49 [273 P. 767]; *People* v. *Hickman,* 204 Cal. 470, 477 [268 P. 909, 270 P. 1117].) These statements have no application, however, to a case such as this where, under the plea of not guilty, the defense is that the accused was incapable of committing the crime because she was not conscious of her acts. As was noted in the Troche case, the Legislature has deemed it wise to provide that the plea of insanity at the time of the commission of the offense must be made in a special manner, but the issue of consciousness may be raised under the plea of not guilty, and no special plea is necessary. (See *People* v. *Methever,* 132 Cal. 326, 329 [64 P. 481]; *People* v. *Coston,* 82 Cal.App.2d 23, 39-41 [185 P.2d 632]; *People* v. *Cox,* 67 Cal.App.2d 166 [153 P.2d 362]; *People* v. *Freeman,* 61 Cal. App.2d 110 [142 P.2d 435]; *People* v. *Sameniego,* 118 Cal. App. 165, 173 [4 P.2d 809, 5 P.2d 653].) The Penal Code

treats insane persons differently from those who commit an act without being conscious thereof. (Pen. Code, §§ 21, 26, 1026, 1369, 1370.) Under subdivision 5 of section 26, persons are incapable of committing crime who do the act charged without being conscious thereof, and it has been held that this subdivision "does not contemplate cases of unsound mind, —that is, cases of idiots, lunatics, and insane persons,—but upon the contrary, contemplates only cases of persons of sound mind" who suffer from some force that leaves their acts without volition. (*People* v. *Methever,* 132 Cal. 326, 329 [64 P. 481]; *People* v. *Rothrock,* 21 Cal.App.2d 116, 119-120 [68 P.2d 364]; see *People* v. *Cox,* 67 Cal.App.2d 166 [153 P.2d 362] [blow on the head]; *People* v. *Freeman,* 61 Cal. App.2d 110 [142 P.2d 435] [epilepsy]; 18 So.Cal.L.Rev. 290 [1945].)

The error in instructing the jury that defendant had the burden of proving unconsciousness by a preponderance of the evidence was not cured by the further statement in the instruction that "The rule of law just announced does not change, or make an exception to, the law which places upon the people the burden of proving defendant's guilt beyond a reasonable doubt." The quoted sentence is directly contrary to the portion of the instruction heretofore criticized and could have served only to confuse the jury.

Finally, defendant urges that she was prevented from having a fair trial by the activities of a self-styled "citizens committee," which attempted to influence the conduct of the trial and the verdict of the jury. When the judge learned that one of the jurors had been approached by an unidentified person on behalf of the committee, and that other jurors knew of the incident, he immediately offered to declare a mistrial. Although the offer was declined, questions involving the fundamental rights of defendant are presented, certain aspects of which have not been mentioned by the parties, and additional briefs would be required if we were to pass upon them. However, our decision need not be delayed for this purpose as we are of the opinion that the errors heretofore noted require a reversal of the judgment.

The evidence, which consisted almost entirely of statements made by defendant, is conflicting and contradictory as to certain essential elements of the crime, and, while legally sufficient, furnishes weak support for a judgment imposing the extreme penalty. In view of the state of the

record, we conclude that the cumulative effect of the errors resulted in a miscarriage of justice.

The judgment and the order denying a new trial are reversed.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.