Filed 7/8/22; Opinion after vacating prior opinion

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076297 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD270002) |
| HAYDEN ABRAHAM GERSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth K. So, Judge.  Affirmed as modified, sentence vacated, and remanded for resentencing.

George L. Schraer for Defendant and Appellant.

Xavier Becerra, Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Charles C. Ragland, Assistant Attorneys General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General for Plaintiff and Respondent.

_____

*        Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II, III, and IV.

Hayden Abraham Gerson attacked two police officers attempting to detain him after he refused to comply with their orders. This attack led to a SWAT standoff and gun battle between Gerson and two SWAT officers. After Gerson choked and bit a police K-9, multiple officers were able to subdue and arrest him.

A jury found Gerson guilty of two counts of attempted voluntary manslaughter (Pen. Code, §§ 664, 192, subd. (a)),[1] a lesser included offense of attempted murder (§§ 664, 187, subd. (a)) charged in counts 1 and 2; two counts of assaulting a peace officer with a semiautomatic firearm (counts 3-4, § 245, subd. (d)(2)); shooting at an inhabited house (count 5, § 246); assault on a peace officer with force likely to produce great bodily injury (count 6, § 245, subd. (c)); making a criminal threat (count 7, § 422); exhibiting a firearm to a peace officer to resist arrest (count 8, § 417.8); two counts of resisting an executive officer (counts 9-10, § 69); and harming or interfering with a police animal (count 11, § 600, subd. (a)). The jury also found true various enhancements to these offenses. The jury found Gerson to be sane during commission of the offenses. The trial court sentenced Gerson to a total term of 33 years eight months in prison.

Gerson appeals, contending that the judgment must be reversed because the trial court erred when it denied his motion for pretrial diversion based on a mental disorder. Assuming we reject this argument, he argues that counts 1 to 5, 8, and 11 must be reversed based on errors regarding the unconsciousness instruction. He challenges the sufficiency of the evidence supporting his convictions for assaulting a peace officer with a semiautomatic firearm (counts 3, 4) and criminal threats (count 7). Gerson also claims that

---

1 Undesignated statutory references are to the Penal Code.

the sentences imposed on counts 7 and 8 must be stayed under section 654 because he committed these counts and count 6 for the same criminal purpose—to prevent his arrest. Finally, Gerson asserts that he is entitled to 608 days of preconviction custody credit (§ 2900.5, subd. (a)) and 91 days of preconviction conduct credit (§ 4019) for the time he spent subject to electronic monitoring on home detention.

In the published portion of this opinion, we conclude that substantial evidence supported the trial court's finding that Gerson did not meet his burden of showing he suffered from bipolar disorder, a mental disorder that qualifies for pretrial diversion. Accordingly, its ruling denying Gerson's motion for pretrial diversion did not amount to an abuse of discretion. We also conclude that an individual, such as Gerson, who is out on bail and subject to electronic monitoring on home detention is similarly situated to persons participating in an electronic monitoring program pursuant to section 1203.018 and that a rational basis does not exist for treating these categories of individuals differently. Accordingly, Gerson is entitled to preconviction custody credit (§ 2900.5, subd. (a)) and preconviction conduct credit (§ 4019) under the state and federal equal protection clauses.

In unpublished parts II, III, and IV, we reject Gerson's remaining arguments.

On June 6, 2022, Gerson filed a motion to recall the remittitur based on ineffective assistance of appellate counsel in failing to raise Assembly Bill No. 124 (2021-2022 Reg. Sess.) (Assembly Bill 124), which amended section 1170 to make the low-term sentence presumptively appropriate under specified

circumstances.[2] He requested that we remand the proceedings for resentencing in light of Assembly Bill 124. In new published part VI, we address the merits of the motion. Simultaneously with this opinion, we issue an order granting the motion to recall the remittitur. In part VI, we also agree with Gerson that remand is necessary so that the trial court may exercise its discretion to resentence him under Assembly Bill 124. Accordingly, we affirm the judgment as modified but vacate Gerson's sentence and remand for resentencing. No changes to our initial opinion are otherwise made.

---

[2] During the 2021-2022 legislative term, the Legislature introduced three bills proposing changes to section 1170 in a variety of ways. (Assembly Bill 124 (Stats. 2021, ch. 695, § 5), Assembly Bill No. 1540 (Stats. 2021, ch. 719, § 2), and Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3).) The three bills were approved by the Governor and filed with the Secretary of State on October 8, 2021. Senate Bill No. 567 bears the highest chapter number and is presumed to be the last of the three approved by the Governor. (Gov. Code, § 9510.) To the extent there are conflicts between the three bills, Senate Bill No. 567 takes precedence. (*In re Thierry S.* (1977) 19 Cal.3d 727, 738-739.) Because the bills are not in conflict and the changes at issue in this appeal were introduced by Assembly Bill 124, for ease of discussion, we refer to Assembly Bill 124 rather than Senate Bill No. 567. (See *People v. Banner* (2022) 77 Cal.App.5th 226, 243, fn. 2 (conc. & dis. opn. of Detjen, Acting P. J.) (*Banner*).)

A.    *Events Leading to Gerson's Crimes*

Gerson and Alisha F. dated for eight months before breaking up in May 2016[4] because Gerson's "drug use was out of control."  While Gerson and Alisha dated, Gerson was fascinated with solar energy.  Gerson testified that he and a childhood friend, Matthew M., started their own solar installation company and that they both ran the business.  Matthew, however, testified that he started the company, Gerson worked for him and was never a co-owner of the company.  Matthew described Gerson as a person who had a temper, often exaggerated things, and "always thrived off conflict."  Matthew knew Gerson to be an argumentative person who blew things out of proportion.

About two months before his arrest, Gerson told Matthew that he started using DMT[5] and "mushrooms."  Matthew noticed changes in Gerson after Gerson started using drugs, including "constantly" talking about various conspiracy theories, claiming he was God and that he had special powers.  Gerson also started using extremely offensive language such as calling women "cunts" and telling Jewish people that he was "Hitler."  Although Matthew stated that Gerson was prone to verbal conflict, physical

---

[3]    This section provides a general background regarding Gerson's crimes. The facts related to the specific claims at issue in this appeal will be discussed in section B, *post.*

[4]    Undesignated date references are to 2016.

[5]    DMT (dimethyltryptamine) is a hallucinogenic drug.  (Merriam-Webster's Unabridged Dict. Online (2022) < https://unabridged.merriam-webster.com/unabridged/dimethyltryptamine> [as of July 2022], archived at https://perma.cc/ HT7W-ZPMP.)

conflict would be "unusual" but that the type of behavior Gerson engaged in changed after Gerson started using drugs. Matthew witnessed Gerson "high" from marijuana hundreds of times but described Gerson on other drugs as "something totally, totally different."

During the summer and fall, Gerson began studying Hinduism, started chanting and meditating, used different psychedelic drugs, and started inhaling nitrous oxide.[6] In November, Gerson called Alisha and told her "crazy stuff" such as bringing her deceased sister back. Alisha suspected that Gerson's drug use caused him to become delusional and not in touch with reality. Gerson later told Alisha that he had been using drugs when he made that telephone call. During this time, Gerson's social media postings referred to his use of DMT as "life changing" and that mushrooms changed his perspective about death and "now I don't fear death." Gerson referred to psychedelic drugs as "medicine." In another post he wrote that " 'cops are the biggest criminals.' "

On the night of December 12, Alisha contacted Gerson and he invited her to come over. When Alisha arrived, she knew Gerson was intoxicated based on his large eyes, rapid movements, and the tone of his voice. She had never seen Gerson this intoxicated before. Gerson told Alisha that "he was eating mushrooms for breakfast, lunch, and dinner." Gerson admitted at trial that he was under the influence of psilocybin[7] and nitrous oxide at the time and had also used cannabis that day. Alisha surreptitiously recorded

---

[6] Nitrous oxide produces a mild euphoria but in large amounts it is an anesthetic that can cause dizziness, an inability to think clearly, a dreamlike state, and amnesia.

[7] Psilocybin is the active ingredient in a variety of hallucinogenic mushrooms.

Gerson with her cell phone. Gerson made delusional statements such as causing it to snow in Hawaii and having control because he was Lord Shiva.[8] Gerson then inhaled about 14 canisters of nitrous oxide in front of Alisha.[9]

Alisha called the police and told them she had a "5150" with her ex-boyfriend and she needed someone to come over immediately.[10] After the 911 operator ascertained that Gerson was not hurting himself or Alisha, the operator asked Alisha to call a non-emergency number. Instead, Alisha texted a friend and asked her to call the police. A police dispatcher later called Alisha to ask if Gerson was being violent. Alisha falsely answered that Gerson was violent so that the police would respond.

B.    *Gerson's Crimes*

San Diego Police Officers John White and Melanie Bognuda arrived at Gerson's home where Alisha informed Officer Bognuda that Gerson was on drugs and thought he was Lord Shiva. After Gerson refused to comply with Officer White's command to walk towards him, both officers tried to grab Gerson's arms to put him in handcuffs while Gerson physically resisted. Officer White deployed his Taser when Gerson ignored his order to get on the ground. The Taser had no effect on Gerson. Gerson then punched Officer Bognuda in the face. Officer White tackled Gerson and both men fell to the ground.

---

[8]    In Hinduism, Shiva is a manifestation of one God.

[9]    A "normal" dose of nitrous oxide is two to three canisters.

[10]    Welfare and Institutions Code section 5150, subdivision (a) permits peace officers and designated mental health professionals to take persons considered a danger to self or others into custody "for a period of up to 72 hours for assessment, evaluation, and crisis intervention."

Gerson, who started training in jiu jitsu as a teenager, put Officer White in a chokehold. Officer Bognuda hit Gerson's body with her baton as Gerson maintained his chokehold on Officer White. Gerson released Officer White after Bognuda hit Gerson in the head with her baton. While Officer White gasped for breath, Gerson stated "I'm gonna fucking kill you" and "I will fucking murder you now." As the officers hid behind a parked car, Gerson retreated to his home and then came outside carrying a semiautomatic handgun. He repeatedly racked the gun's slide. The officers recognized that Gerson's gun was unloaded based on his continual racking of the gun. Gerson then went back inside his house.

The police deployed two SWAT officers to the scene who positioned themselves on the roof of a neighbor's home and watched a window of Gerson's home where Gerson was located. At some point, Gerson fired a shot from the room. A gunfight ensued as the SWAT officers began shooting towards the window while Gerson fired back.

The officers then shot tear gas into the house, which caused Gerson to run out the front door. Gerson ignored the officers' commands to get on the ground, which caused them to shoot Gerson with less-than-lethal rounds. A handler then released a police K-9 to bite and hold Gerson.

The dog bit Gerson and held contact. Gerson immediately grabbed the dog's head, flipped it on its back and started choking the K-9. Gerson also bit the dog. The K-9 released its bite and fell unconscious. Officers rushed in and after a significant struggle, detained Gerson by placing him in a body wrap.

C.   *Post-arrest Evidence*

The police transported Gerson to the hospital where an emergency room physician diagnosed him as suffering agitated delirium from abusing

several substances. Based on Gerson's agitation and failure to follow commands, the doctor administered four different sedatives so they could do a CT scan to check for a head injury. The CT scan revealed no acute intracranial abnormality. Toxicology results showed the presence of THC, indicating that Gerson had recently used marijuana. The tests also detected the presence of a metabolic breakdown product of psilocybin. A test to detect nitrous oxide was not performed because this compound leaves the blood very quickly. The physician concluded that Gerson was suffering from "toxic encephalopathy" consistent with potential neurological issues from using an inhalant and this condition caused Gerson's delirium.

Police detectives interviewed Gerson immediately after his release from the hospital. Gerson claimed that he had acted in self-defense. After informing Gerson that he would be transported to jail, Gerson asked how many felonies he would be charged with and whether any of the charges were wobblers or misdemeanors. When told that he would be charged with attempted murder, Gerson responded that he did not attempt to murder a police officer—"[t]hose guys are being such fuckin' dramatic pussies. I didn't fuckin' shoot at them. They shot at me." He claimed that after the officers started shooting at him he fired his gun into the air as a warning for them to leave him alone.

After his arrest, Gerson spent time in county jail and then received treatment in a locked unit at Alvarado Parkway Institute (Alvarado) as a condition of bail. The trial court later modified Gerson's bail conditions to allow him to reside at Casa Palmera for further treatment. Records from Casa Palmera noted that Gerson's test results demonstrated no evidence of psychosis or mania, that Gerson demonstrated no symptoms indicating a need for psychotropic medication, and that Gerson was " 'less likely to have

9

been suffering from bipolar than a substance induced psychosis.' " Gerson was then discharged on bail to home detention with a GPS device and subject to other conditions.

At trial, Gerson claimed that he used psilocybin and DMT as introspective tools related to his spiritual journey. He testified that after being tased and hit with the baton, he could not make any thoughtful decisions and did not remember most of his actions. After going through the incident in his head "a million times," Gerson could not explain his actions. Defense counsel told the jury that Gerson's delirium was a form of unconsciousness and Gerson should not be held responsible for his actions.

## DISCUSSION

### I. THE TRIAL COURT DID NOT ERR WHEN IT DENIED PRETRIAL DIVERSION

A. *Legal Principles*

Section 1001.36 authorizes courts to grant pretrial diversion to defendants who meet the statute's six qualifying criteria or eligibility requirements. (§ 1001.36, subds. (a), (b)(1); *People v. Williams* (2021) 63 Cal.App.5th 990, 995.) One purpose of the program is to increase "diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety." (§ 1001.35, subd. (a).) If mental health diversion is granted and the defendant satisfactorily completes the court's approved mental health treatment program, then the defendant's criminal charges are required to be dismissed and the defendant's arrest on the charges "shall be deemed never to have occurred." (§ 1001.36, subd. (e).)

Mental disorders that qualify for diversion include, but are not limited to, "bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder." (§1001.36, subd. (b)(1)(A).) Excluded disorders

10

are "antisocial personality disorder, borderline personality disorder, and pedophilia." (*Ibid.*) The defendant bears the burden of making a prima facie showing that he or she meets the minimum requirements of eligibility for diversion. (§ 1001.36, subd. (b)(3); see Evid. Code, § 500 ["Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he [or she] is asserting."].)

The court "may" (§ 1001.36, subd. (a)) grant pretrial diversion if a defendant meets all six enumerated requirements: (1) the court is satisfied that the defendant suffers from a mental disorder identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM); (2) the court is satisfied the "defendant's mental disorder was a significant factor in the commission of the charged offense"; (3) a qualified mental health expert opines "the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment"; (4) the defendant "consents to diversion and waives [his or her] right to a speedy trial"; (5) the defendant "agrees to comply with treatment as a condition of diversion"; and (6) the court is satisfied "the defendant will not pose an unreasonable risk of danger to public safety . . . if treated in the community." (§ 1001.36, subd. (b)(1)(A)-(F).) Even if a defendant otherwise satisfies the six eligibility requirements, the court must also be satisfied that the recommended mental health treatment program "will meet the specialized mental health treatment needs of the defendant." (§ 1001.36, subd. (c)(1)(A); *People v. Frahs* (2020) 9 Cal.5th 618, 627 (*Frahs*).)

The trial court's determination "whether the defendant's disorder played a significant role in the commission of the charged offense" is "a quintessential factfinding process" subject to review for substantial evidence.

(*People v. Oneal* (2021) 64 Cal.App.5th 581, 589 (*Oneal*).) Similarly, the court's determination whether the defendant suffers from a mental disorder under subdivision (b)(1)(A) of section 1001.36 involves evaluating expert testimony and making conclusions based thereon and is also reviewed for substantial evidence.

"On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends." (*Ibid.*)

" 'We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support [a trial court's factual finding].' " (*People v. Brown* (2014) 59 Cal.4th 86, 106.) " ' "To warrant the rejection of the statements given by a witness who has been believed by [the trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 519.) Conversely, the trier of fact generally may reject even uncontradicted testimony, whether by lay or expert witnesses, so long as the rejection is not arbitrary. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 632 (*Howard*).)

Ultimately, however, diversion under section 1001.36 is discretionary, not mandatory, even if all the requirements are met. (§ 1001.36, subd. (a)

12

["the court may" grant pretrial diversion], subd. (b)(1) ["[p]retrial diversion may be granted" if certain criteria are met]; see *Frahs, supra,* 9 Cal.5th at p. 626 [implying that a court may exercise its discretion to deny an eligible defendant mental health diversion].)  We therefore review for abuse of discretion the trial court's decision whether to grant a request for mental health diversion.  (*People v. Moine* (2021) 62 Cal.App.5th 440, 448 (*Moine*).)  "A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence."  (*Id.* at p. 449.)

      1.     Additional Background

Gerson filed a motion for mental health diversion pursuant to section 1001.36.  The motion was a proverbial battle of the experts.  Dr. Clark Smith, Gerson's defense expert, was a psychiatrist in private practice.  Dr. Smith opined that Gerson suffered from, among other things, bipolar disorder with psychotic features.  Dr. Alan Abrams, a forensic and addiction psychiatrist appointed by the court, explained that bipolar disorder can be an endogenous mental illness or a substance-induced mental illness.[11]  In his July 2018 report, he initially diagnosed Gerson with substance induced bipolar disorder and hypomania, noting that Gerson has been sober for 20 months and "there is no current evidence of an endogenous psychotic mental disorder."

---

[11]    Endogenous refers to a condition "originating in the individual's own psychodynamics rather than through external causes."  (Merriam-Webster's Unabridged Dict. Online (2022) < https://unabridged.merriam-webster.com/unabridged/endogenous> [as of July 2022], archived at https://perma.cc/V4XG-4XMB.)

The People opposed the motion arguing, among other things, that Gerson was ineligible for diversion because he did not suffer from a qualifying mental disorder. A report from Dr. Nichole Friedman, a court appointed licensed psychologist, opined that at the time of the offenses, Gerson suffered from "Other Specified Personality Disorder (mixed personality features including Narcissistic Personality Features)." Dr. Friedman concluded that Gerson did not have a qualifying mental disease or defect at the time of the incident. Rather, she believed that his "voluntary substance use (cannabis, mushroom, nitrous oxide) in conjunction with his interpersonal reactivity, grandiose self-importance, entitlement, [and] hostility, resulted in the alleged violence."[12]

In January 2019, the court held a hearing on the motion over the course of three days. At the hearing, Dr. Abrams changed his diagnosis to opine that Gerson suffered from bipolar II disorder, most recently manic. His updated diagnosis relied on people who had continued contact with Gerson, and on the symptoms that Gerson displayed after drugs would have been out of his system. Dr. Smith similarly opined that Gerson suffers from bipolar disorder with psychotic features that is independent of substance use.

Dr. Friedman also testified at the hearing. She conducted the Minnesota Multiphasic Personality Inventory (MMPI) on Gerson to objectively measure his personality. She disagreed with the bipolar diagnoses rendered by Drs. Smith and Abrams because one criterion for bipolar disorder is that the person must be without substances and Gerson was always "under the influence of substances preceding the incident." Dr.

---

[12] Drs. Abrams and Friedman both opined that at the time of the incident, Gerson suffered from psilocybin, nitrous oxide and cannabis intoxication, with a use disorder for each drug.

14

Friedman opined that Gerson did not meet the DSM, fifth edition (DSM-5) criteria for bipolar disorder and thus did not have a qualifying mental disorder under section 1001.36.

After considering this conflicting testimony and hearing extensive argument from counsel, the trial court denied Gerson's request for diversion finding that: (1) Gerson posed an unreasonable risk of danger to public safety if treated in the community; (2) the recommended outpatient treatment program would not meet Gerson's specialized needs and thus Gerson had not demonstrated a suggested program for effective treatment and supervision; and (3) it could not determine if Gerson suffered from bipolar disorder. The court considered the question whether Gerson suffered from a mental disorder to be "complex" and "very difficult" to address without a full and complete analysis of Gerson's life. Although Gerson's family and friends indicated that Gerson suffered from a period where he "decompensated," he also had an above average number of conflicts in his life that suggested to the court that Gerson had a "deeper personality issue" that took him outside the diversion statute. The trial court denied the motion, concluding that the evidence raised questions regarding the validity of the diagnosis that Gerson suffered from bipolar disorder.

2.      Analysis

Gerson argues that insubstantial evidence supports Dr. Friedman's diagnosis that he has a personality disorder because: (1) the diagnosis conflicts with the evidence showing that his mental state underwent a drastic change shortly before the incident; and (2) she did not explain what behaviors in his past showed characteristics of a personality disorder. He also claims Dr. Friedman's finding that he does not suffer from bipolar disorder is not credible because it ignores the DSM-5 definition for bipolar disorder and,

15

consistent with DSM-5 guidelines, his bipolar disorder was not substance-induced because he continued to have bipolar symptoms months after he stopped using all drugs.

These arguments improperly frame the issue regarding denial of the diversion motion. It was Gerson's burden to present evidence that he suffered from a qualifying mental disorder. (§ 1001.36, subd. (b)(3); Evid. Code, § 500.) Accordingly, we believe the issue is more precisely framed as whether Gerson met his burden of presenting evidence that he suffered from endogenous bipolar disorder. The trial court's statements after a lengthy hearing show that, based on the totality of the evidence, it was not convinced that Gerson met his burden of showing he suffered from endogenous bipolar disorder, a qualifying mental disorder. As we shall explain, there is sufficient evidence in this record to support the trial court's conclusion that Gerson had not met his burden of proof.

Dr. Friedman concluded that Gerson's violent behavior resulted from his voluntary substance use combined "with his interpersonal reactivity, grandiose self-importance, entitlement, [and] hostility." She opined that at the time of the offenses, Gerson suffered from a personality disorder and did not meet the DSM-5 criteria for bipolar disorder. She used the MMPI to objectively measure Gerson's personality and noted that Drs. Abrams and Smith did not have Gerson take the MMPI. Dr. Friedman considered the MMPI data to be valid and explained that it provided a means of validating what Gerson described.

On the MMPI, Gerson scored high regarding authority problems such as opposition to authority figures, dislike of school, and lack of constraint. He also scored high on "persecutory ideas, meaning the ideas of external influence," and "on naivety, which deals with moral righteousness." Dr.

16

Friedman considered these scores to be important in terms of the grandiosity and moral righteousness that Gerson exhibited and in terms of his personality psychopathology. Gerson scored "at the cutoff" in terms of psychoticism, which deals with personality factors such as views of the external world, unusual beliefs or experiences and the intent to overindulge or daydream. Nonetheless, Dr. Friedman found Gerson's personality to be vulnerable to these factors.

Based on Gerson's MMPI results, Dr. Friedman stated that he "fits th[e] bill" for "a personality of paranoid grandiosity" because throughout his life he had a paranoid feeling about authority and grandiosity. Gerson's "inflated self-esteem or grandiosity" also fit "with the traits of [a] narcissistic personality." Dr. Friedman concluded that Gerson suffered from a personality disorder by looking at all the evidence, noting that Gerson exhibited a sense of entitlement, selfishness, lack of empathy, grandiosity, disregarded rules, acted out, was impulsive, had low frustration tolerance, and "can be perceived as being arrogant and can be arrogant." Contrary to Gerson's contentions, the record and Gerson's characteristics supported Dr. Friedman's conclusion that he suffered from a personality disorder.

More importantly, this evidence is sufficient to undermine the court's confidence in the validity of the competing bipolar disorder diagnosis. First, Drs. Smith and Abrams did not determine whether Gerson had a personality disorder. Dr. Smith testified he did not have enough information to reach a conclusion that Gerson suffered from a personality disorder because he lacked information about Gerson "as a person before he got all involved with the drugs." Dr. Abrams similarly admitted that he did not "have a very good sense" of Gerson as a person before he got involved with drugs and to make a personality disorder diagnosis he "need[ed] way more evidence."

17

Second, Drs. Smith and Abrams considered Gerson's acute personality change in fall 2016, as observed by Gerson's friends and relatives, as significant in diagnosing him as suffering from bipolar disorder. Dr. Friedman addressed Gerson's personality change during this time period in her testimony. Gerson increased his drug use around August, which Dr. Friedman noted is when Gerson's mother noticed a decline in his mental health. Gerson's brother-in-law and his employer both opined that Gerson's personality shift occurred in about October. Drugs that Gerson started using in the fall before the incident included DMT, ayahuasca,[13] and nitrous oxide. Gerson reported being on a five-day "binge" of psilocybin mushrooms before the incident. Dr. Friedman considered Gerson's drug use as significant in her analysis, stating that Gerson "has used an exorbitant amount of hallucinogens." Accordingly, Dr. Friedman disagreed with the diagnoses of Drs. Abrams and Smith that Gerson was bipolar, manic because Gerson was always "under the influence of substances preceding the incident."

Third, Drs. Smith and Abrams opined that Gerson's drug use leading up to the incident did not cause his behavioral change before the incident because Gerson's symptoms persisted long after his drug use stopped. Dr. Smith stated that bipolar symptoms that persisted after Gerson stopped using drugs included pressured speech, irritability, increased activity, and psychotic delusions. Dr. Abrams also mentioned grandiosity and paranoia.[14]

---

[13]    DMT is the active ingredient in ayahuasca.

[14]    DSM-5 diagnostic criteria for "Bipolar II Disorder" during a hypomanic episode include: "A. A distinct period of abnormally and persistently elevated, expansive, or irritable mood and abnormally and persistently increased activity or energy, lasting at least 4 consecutive days and present most of the day, nearly every day. [¶] B. During the period of mood

18

The trial court asked Dr. Friedman about the testimony that Gerson's persistent symptoms of delusion and grandiosity, without drug use, supported a conclusion that Gerson suffered from bipolar disorder.

Dr. Friedman gave an alternate explanation for Gerson's continued symptoms while off drugs. She explained that Gerson's grandiosity related to him having a narcissistic personality. She stated that delusions were not part of bipolar disorder and explained Gerson's delusions as experiences he had during prior drug use that he considered as fact:

> "So his delusions are also—when he describes his delusions to me, it's his experience when he's been under the influence of, let's say, mushrooms. He's had these experiences, and that becomes his experience, becomes his fact. [¶] Just like if someone is on mushrooms and they said, I can fly. They had this feeling they could fly. That's

---

disturbance and increased energy and activity, three (or more) of the following symptoms have persisted (four if the mood is only irritable), represent a noticeable change from usual behavior, and have been present to a significant degree: 1. Inflated self-esteem or grandiosity. [¶] 2. Decreased need for sleep (e.g., feels rested after only 3 hours of sleep). [¶] 3. More talkative than usual or pressure to keep talking. [¶] 4. Flight of ideas or subjective experience that thoughts are racing. [¶] 5. Distractibility (i.e., attention too easily drawn to unimportant or irrelevant external stimuli), as reported or observed. [¶] 6. Increase in goal-directed activity (either socially, at work or school, or sexually) or psychomotor agitation. [¶] 7. Excessive involvement in activities that have a high potential for painful consequences (e.g., engaging in unrestrained buying sprees, sexual indiscretions, or foolish business investments). [¶] C. The episode is associated with an unequivocal change in functioning that is uncharacteristic of the individual when not symptomatic. [¶] D. The disturbance in mood and the change in functioning are observable by others. [¶] E. The episode is not severe enough to cause marked impairment in social or occupational functioning or to necessitate hospitalization. If there are psychotic features, the episode is, by definition, manic. [¶] F. The episode is not attributable to the physiological effects of a substance (e.g., a drug of abuse, a medication or other treatment)."

delusional for most of us.  We think that's delusional.  You can't fly.  [¶]  They had the experience.  That's what they are stating.  That's their belief.  Doesn't mean they are bipolar."

Dr. Friedman did not consider Gerson's pressured speech to be abnormal, stating that Gerson is talkative and "can speak fast."  She remembered reading that Gerson came across as irritable at times.  While one reporter found Gerson to be distractible, she found him to be "goal directed" and nothing in the records suggested that jail personnel perceived him to be manic but that he "came across as . . . irritable at times."  Jail records also did not suggest that Gerson displayed psychomotor agitation.  Finally, she noted that Gerson has not displayed a marked impairment in social functions, that he has "been functioning" and running a business.  She concluded, "I just don't believe he meets the criteria for bipolar."

From a clinical perspective, Dr. Friedman opined that Gerson's drug use and personality caused his actions on the date of the incident.  She explained that Gerson "made a host of different choices that night that led to him feeling that he was threatened by the police.  And he felt like [the police] were out to, as he stated, kill him.  He was going to self-protect himself.  That's what he did.  And at the time he was on substances, and he was amped up.  And trying to calm him down at the same time and because of his personality and how he feels about authority, he behaved in the way he did."

Dr. Friedman specifically noted that right before the incident Gerson had a massage and his masseuse described Gerson as his normal self and not exhibiting manic or delusional behavior.  In her experience people in a state of mania cannot relax and "are not going to go for a massage."  Additionally, at the start of the incident she noted that Gerson was "relaxed" and confused

regarding why the officers wanted to detain him. This evidence suggested to Dr. Friedman that Gerson did not have mania or bipolar disorder.

Dr. Friedman attributed Gerson's behavior to a combination of his personality and narcotics use, as opposed to delirium, because Gerson had the ability to explain why he did certain things during the incident. As examples, Dr. Friedman referred to Gerson's statements that he opened his computer to listen to chanting music because he did not have his phone and had last used his computer to listen to chanting music. This suggested to her that Gerson "wasn't so delirious that he was unable to . . . know his past or navigate through his own home or not understand reality. He knew what he was doing. It was something as simple as turning on the chanting music, which he then used, I believe, to calm himself down." Additionally, during Gerson's interview with officers, he questioned whether the charges against him were wobblers or misdemeanors. Dr. Friedman considered this to be "pretty sophisticated" and that Gerson knew he had done something that could warrant a felony charge.

Contrary to Gerson's arguments, Dr. Friedman considered the DSM-5 guidelines in making her diagnosis, explained why she believed his actions were substance-induced, and noted how Gerson's personality explained his perceived bipolar symptoms after he stopped using all drugs. The record shows that the trial court understood Gerson's argument that his drastic personality change shortly before the incident was attributable to the onset of endogenous bipolar disorder. The court, however, also noted the counter-argument that Gerson had certain personality features such as grandiosity and paranoia that his drug use exacerbated. Ultimately, after considering the competing evidence, it concluded "sufficient questions [were] raised about

21

the bipolar diagnosis that [it was] not satisfied that [the] burden has been met."

The trial court came to this conclusion after a three-day evidentiary hearing and over three hours of oral argument where it frequently interrupted counsel to ask questions, and often engaged in a dialogue with counsel. Dr. Friedman's testimony cast doubt on the competing bipolar diagnosis; thus, the trial court's rejection of the competing diagnosis was not arbitrary. (*Howard, supra*, 72 Cal.App.4th at p. 632.) As a reviewing court, we do not reweigh the evidence or resolve evidentiary conflicts. (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1158.) Rather, we are bound by the principle that "[t]he testimony of a single witness can be sufficient to uphold [the trial court's factual finding] even when there is significant countervailing evidence, or the testimony is subject to justifiable suspicion." (*Ibid.*)

Based on the totality of the evidence, the trial court could have reasonably concluded that the changes observed by Gerson's relatives and his employer in fall 2016 were attributable to his personality and significant drug use, and not the emergence of bipolar disorder. It could have also reasonably concluded that Gerson's personality disorder explained his continued symptoms after he stopped using drugs. (*People v. Venghiattis* (1986) 185 Cal.App.3d 326, 333 [it is not an abuse of discretion for the trial court to give more credit to one expert's opinion than to another's].) It is not within our province to reweigh the evidence.

In sum, substantial evidence supported the trial court's finding that Gerson did not meet his burden of showing that he suffered from bipolar disorder. Accordingly, its ruling denying the motion for pretrial diversion did

not amount to an abuse of discretion.  (*Moine, supra,* 62 Cal.App.5th at
p. 449.)[15]

## II.     ALLEGED INSTRUCTIONAL ERROR

A.     *The Trial Court Correctly Declined to Amplify CALCRIM No. 3425*

1.     Additional Background

Gerson asked the trial court to give a jury instruction on
unconsciousness with additional language related to unconsciousness found
in *People v. James* (2015) 238 Cal.App.4th 794 (*James*) that stated:  "One who
is unaware of his or her actions because of the lack of volitional capacity does
not commit an act with either specific or general criminal intent."  (*Id.* at
p. 809.)  After the trial court indicated it was inclined to give CALCRIM No.
3425 without the additional language from *James*, Gerson's counsel
responded that he wanted to modify the instruction to the facts of the case so
that it identified the factors supporting a finding of unconsciousness,
including the blow to the head that Gerson suffered, the tasing, and
unsoundness of mind resulting from mental illness.  The prosecutor did not
object to the giving of an unconsciousness instruction but objected to the
proposed additional language as prejudicial.

Lengthy discussions with counsel ensued.  During these discussions,
Gerson's counsel again asked the court to add to CALCRIM No. 3425 the

---

[15]     Because the evidence supported the trial court's conclusion that Gerson
did not suffer from a qualifying mental disorder, we need not address his
remaining arguments that the evidence did not support the findings that he
posed an unreasonable risk of danger or that the recommended treatment
program would not meet his needs.  Even if we assumed these two findings
are not supported by the record, Gerson is not entitled to a reversal based on
the court's conclusion that he did not suffer from a qualifying mental
disorder.  (*Oneal, supra,* 64 Cal.App.5th 581.)

sentence from *James* stating: "One who is unaware of his or her actions because of the lack of volitional capacity does not commit an act with either specific or general criminal intent." (*James*, *supra*, 238 Cal.App.4th at p. 809.) The court ultimately read the jury a modified version of CALCRIM No. 3425. The court's minor changes to the standard instruction are in italics:

> "The defendant is not guilty of *any charges* if he acted while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. Someone may be unconscious even though able to move. Unconsciousness may be caused by a black-out, or an epileptic seizure or involuntary intoxication, *blow to the head, mental illness, or other similar condition*. The defense of unconsciousness may not be based on voluntary intoxication.

> "The People must prove beyond a reasonable doubt that the defendant was conscious when he acted. If there . . . is proof beyond a reasonable doubt that the defendant acted as if he were conscious, you should conclude that he was conscious. Unless based on all the evidence, you have a reasonable doubt that he was conscious, in which case you must find him not guilty."

2. Analysis

"[U]nconsciousness is a complete defense except where it is caused by voluntary intoxication." (*People v. Heffington* (1973) 32 Cal.App.3d 1, 8; see also § 26 ["All persons are capable of committing crimes except those[¶] . . . [¶] Four–Persons who committed the act charged without being conscious thereof."].) "To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.'" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417.) " '[A]n unconscious act within the contemplation of [section 26] is one committed by

24

a person who because of somnambulism, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional.' " (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1315, italics omitted (*Mathson*).) Mental illness can also be the foundation for an unconsciousness defense. (*James*, *supra*, 238 Cal.App.4th at p. 809.)

Gerson argues that he was lucid and conscious during his initial interaction with Officers Bognuda and White but that after being tasered and struck on the head with a baton his behavior became bizarre, irrational, and consistent with unconsciousness. He contends that CALCRIM No. 3425 focused on his mental state (whether he was conscious) and that the requested language from *James*, *supra*, 238 Cal.App.4th 794 focused on his conduct (whether his actions were voluntary and volitional). He asserts that the trial court's failure to add the requested language regarding his volitional capacity to CALCRIM No. 3425 violated his rights under the Sixth Amendment by denying him a meaningful opportunity to present a complete defense. The trial court rejected this pinpoint instruction stating that the first paragraph of CALCRIM No. 3425 already addressed this concept. We agree.

"Pinpoint instructions 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case . . . .' " (*People v. Wilkins* (2013) 56 Cal.4th 333, 348-349.) Such instructions are required to be given upon request when there is evidence supportive of the theory. (*Id*. at p. 349.) A trial court errs when it refuses to give such an instruction. (*People v. Hughes* (2002) 27 Cal.4th 287, 362.) A trial court, however, "may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence." (*People v. Moon* (2005) 37 Cal.4th 1, 30

25

(*Moon*).) We independently review the correctness and adequacy of the trial court's instructions, examining whether the court " 'fully and fairly instructed on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 (*Ramos*).)

The first paragraph of CALCRIM No. 3425 provided: "The defendant is not guilty of any charges *if he acted* while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. Someone may be unconscious even though able to move." (Italics added.) The plain language of the instruction focused the jury's attention on Gerson's actions and whether he was conscious (aware) or unconscious (unaware) of his actions, not on Gerson's intent. Thus, we reject Gerson's argument that CALCRIM No. 3425 erroneously focused on his mental state and not whether he was conscious of his actions. The trial court correctly concluded that the requested pinpoint instruction would have been duplicative. (*Moon*, *supra*, 37 Cal.4th at p. 30.) Accordingly, the trial court did not err in rejecting the proposed pinpoint instruction and we reject Gerson's contention that the purported error violated his constitutional right to present a complete defense.

In any event, as the prosecutor noted during closing argument, the evidence reflected "[a] lot of goal-oriented behavior" that suggested Gerson was conscious of his actions. Dr. Abrams characterized Gerson's acts of retrieving a gun from his house and using more drugs after being tased and hit in the head with a baton as seemingly "nondelirious." The police and defense criminalists testified that Gerson positioned himself where the SWAT officers could not shoot him. The jury heard testimony that Gerson told Dr. Smith that he choked and bit the police K-9 to show the dog that he was the "alpha." During his arrest, Gerson expressed his understanding that

26

the police would release the pressure on his ear if he stopped resisting. Additionally, Gerson's statement during his police interview that he fired his gun into the air as a warning for the SWAT officers to leave him alone undercut his defense that he was unconsciousness of his actions. In summary, this evidence is inconsistent with someone in an unconscious state who is not aware of his actions and not acting with volition.

3.      CALCRIM No. 3425 Did Not Contain Erroneous Language

There is a judicially created presumption that a person who appears to act in an apparent state of consciousness is conscious. (*People v. Hardy* (1948) 33 Cal.2d 52, 63 (*Hardy*); *Mathson, supra,* 210 Cal.App.4th at p. 1317.) As our high court explained, this presumption places a duty on the defendant to produce evidence "raising a reasonable doubt [in the minds of the jury that the defendant acted unconsciously], and not the duty to overcome the presumption by a preponderance of the evidence." (*Hardy,* at p. 64.) A defendant's professed inability to recall an event, without more, is insufficient evidence of unconsciousness. (*People v. Rogers* (2006) 39 Cal.4th 826, 888.)

CALCRIM No. 3425 ended with the following sentence: "*If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious*, you should conclude that he was conscious, unless based on all the evidence, you have a reasonable doubt that he was conscious, in which case you must find him not guilty." (Italics added.) Gerson contends that the italicized language is incorrect in law because it effectively constituted a presumption of consciousness based on the appearance that he acted as a conscious person might act and allowed the jury to reject the unconsciousness defense based simply on him acting as if he were conscious. According to Gerson, the italicized phrase is not needed because the trial court already

27

concluded sufficient evidence existed to justify the unconsciousness instruction and this phrase merely confused concepts. He claims that this error in CALCRIM No. 3425 requires reversal of counts 1 to 5, 8 and 11.

The Attorney General responds that Gerson forfeited this argument by not objecting to CALCRIM No. 3425 on this ground below. He argues that the challenged phrase correctly placed the burden of proving consciousness beyond a reasonable doubt on the People and correctly informed the jury of the concept that if, "based on all the evidence, you have a reasonable doubt that [Gerson] was conscious," the presumption is rebutted and it must acquit.

A party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party failed to object in the trial court. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012 (*Hudson*).) This rule does not apply if the instruction was an incorrect statement of law. (*Id.* at p. 1012; *People v. Gomez* (2018) 6 Cal.5th 243, 312 ["[T]he forfeiture rule 'does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law.' "].) Therefore, to determine whether Gerson forfeited his argument, we must first determine whether the instruction was correct in law. (See *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) Applying the de novo standard of review (*Ramos*, *supra*, 163 Cal.App.4th at p. 1088), we reject Gerson's argument that the italicized phrase is incorrect in law.

CALCRIM No. 3425 informed jurors that to conclude Gerson acted consciously, there must be proof beyond a reasonable doubt that he acted as if he were conscious "unless based on *all the evidence*, you have a reasonable doubt that he was conscious, in which case you must find him not guilty." (Italics added.) The instruction correctly states that if, based on all the evidence the jury has a reasonable doubt that Gerson was conscious, the jury

28

was obligated to find him not guilty.  The instruction also correctly makes the point that the People have the burden of proving consciousness beyond a reasonable doubt.

Additionally, "[w]e must consider the instructions together as a whole, to determine whether it is reasonably likely a jury would interpret an instruction in a particular way, because we presume jurors understand and correlate all of the instructions." (*People v. Burton* (2018) 29 Cal.App.5th 917, 925.)  Here, the court also instructed the jury that evidence is the testimony of witnesses, exhibits, and stipulated facts (CALCRIM No. 222) and it must consider "all the evidence that was received throughout the entire trial" in deciding whether the People proved their case beyond a reasonable doubt (CALCRIM No. 220).  Thus, considering the instructions as a whole, it is not reasonably likely that the jury construed CALCRIM No. 3425 as requiring it to make the consciousness finding based exclusively on Gerson's actions.

Gerson argues that he adequately rebutted the presumption of consciousness by producing enough evidence to warrant an instruction on unconsciousness.  He claims, at that point, the presumption had no further relevance and the jury should have looked at the evidence alone in determining whether he acted consciously.  We disagree.

CALCRIM No. 3425 correctly informed the jury of the judicially created concept that a person who acts conscious is conscious.  (*Hardy*, *supra*, 33 Cal.2d at p. 63.)  A defendant can overcome the presumption regarding consciousness by simply producing sufficient evidence to raise a reasonable doubt that he or she was conscious when he or she acted during the commission of the alleged crime.  (*Id*. at p. 64.)  In other words, the presumption merely placed a duty on Gerson to produce evidence, sufficient

29

to raise a reasonable doubt in the minds of the jury, that he acted unconsciously. (*Id.* at pp. 64-65.) Additionally, CALCRIM No. 3425 does not contain language telling the jury that a "presumption of consciousness" existed. The Judicial Council explained why, consistent with *Hardy*, *supra*, 33 Cal.2d 52, it declined to specifically reference a "presumption of consciousness" in its commentary to CALCRIM No. 3425, stating:

> "The committee did not include an instruction on the presumption of consciousness. There is a judicially created presumption that a person who acts conscious is conscious. (*People v. Hardy* (1948) 33 Cal.2d 52, 63-64 [198 P.2d 865].) Although an instruction on this presumption has been approved, it has been highly criticized. [Citations.] [¶] The effect of this presumption is to place on the defendant a burden of producing evidence to dispel the presumption. [Citations.] However, if the defendant produces enough evidence to warrant an instruction on unconsciousness, the rebuttable presumption of consciousness has been dispelled and no instruction on its effect is necessary. The committee, therefore, concluded that no instruction on the presumption of consciousness was needed." (Judicial Council of Cal., Crim. Jury Instns. (2021), Commentary to CALCRIM No. 3425, pp. 962-963.)

Moreover, the California Supreme Court approved of the manner in which the presumption of consciousness was handled in the 1979 revision of CALJIC No. 4.31, a predecessor to CALCRIM No. 3425. (*Mathson*, *supra*, 210 Cal.App.4th at p. 1321, citing *People v. Babbitt* (1988) 45 Cal.3d 660, 693-694 [" '[T]here is no constitutional impediment to the state's use of a rebuttable presumption in meeting its assumed burden—once the issue has been raised—to prove consciousness beyond a reasonable doubt.' "].)[16]

---

16    In *Mathson*, *supra*, 210 Cal.App.4th 1297, the appellate court criticized the third paragraph of former CALCRIM No. 3425 as "potentially confusing"

30

We conclude that CALCRIM No. 3425 correctly instructed the jury as to the potential legal effect of unconsciousness caused by a mental condition. Therefore, Gerson forfeited this argument by failing to object or request modification in the trial court. (*Hudson, supra,* 38 Cal.4th at pp. 1011-1012.)

III.    CHALLENGES TO THE SUFFICIENCY OF THE EVIDENCE

A.    *Legal Principles*

Where a defendant challenges the sufficiency of the evidence supporting a conviction, we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*Ibid.*) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate

---

and stated the language should be modified. (*Mathson,* at p. 1317.) The *Mathson* court compared the "If, however" formulation of former CALCRIM No. 3425 with CALJIC's "unless" clause and found the former's wording "unnecessarily ambiguous." (*Mathson,* at p. 1323.) The court recommended that CALCRIM No. 3425 be modified to use the "unless" formulation. (*Mathson,* at pp. 1317, 1323, fn. 26.) Gerson's reliance on *Mathson* is misplaced because the language criticized in *Mathson* does not appear in the current version of the jury instruction. Additionally, the *Mathson* court did not hold that the language of former CALCRIM No. 3425 created a mandatory presumption of consciousness. Moreover, at issue in *Mathson* was unconsciousness caused by alcohol intoxication, which prompted the court to criticize the last sentence of the paragraph as applied to that case. (*Mathson,* at p. 1323.)

31

court[,] that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Id.* at pp. 1053-1054.) Reversal for insufficient evidence is warranted only when it appears that under no hypothesis whatsoever is there sufficient evidence to support the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction, unless that testimony is physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

      1.     The Evidence Supported the Criminal Threats Conviction

      a)     *Additional Background*

When Officers White and Bognuda arrived at Gerson's home they believed they were responding to domestic disturbance and 5150 call. Both officers activated their body-worn cameras. Alisha informed Officer Bognuda that Gerson was on drugs and thought he was Lord Shiva. Officer White observed that Gerson spoke rapidly and showed objective symptoms of being under the influence of a controlled substance.

Officer White asked Gerson to walk towards him but Gerson refused to follow the officer's commands. After Officer White told Gerson that he would be detained and reached for him, Gerson responded that he had been "kidding" and did not want to be touched or detained. Both officers tried to grab Gerson's arms to put him in handcuffs while Gerson physically resisted. Officer White called for additional officers.

Officer White directed Gerson to get on the ground or be tasered. When Gerson walked towards Officer White, the officer deployed his Taser. The

Taser had no effect on Gerson. Gerson punched Officer Bognuda in the face giving her a black eye. Officer White then tackled Gerson and the men fell to the ground. While Officer White was on his knees, Gerson put the officer in a chokehold. Officer Bognuda yelled at Gerson to get off Officer White as she pulled out her baton. Officer Bognuda struck Gerson's body with her baton as Gerson maintained his chokehold on Officer White. As Gerson choked him, Officer White was afraid that he would be rendered unconscious and seriously injured. Officer Bognuda knew that a chokehold could potentially kill a person and observed distress in Officer White's eyes. Officer Bognuda, worried for Officer White's life, hit Gerson in the head with her baton. This caused Gerson to immediately release Officer White.

Gerson then stated "I'm gonna fucking kill you" and "I will fucking murder you now." During trial, the court played a recording of Gerson's threats. Officer White testified that he heard some type of threat but could not recall the exact words. At that time Officer White was concerned for his safety thinking that Gerson might come after him with more force as he tried to catch his breath.

Officer Bognuda deployed her Taser but it had no effect on Gerson because both of the Taser's barbs did not connect to Gerson's body. After a second Taser attempt, Gerson yelled at the officers and then went inside his house. The officers had retreated behind a parked car when Gerson came outside carrying a semiautomatic handgun and racked the gun's slide. Officer Bognuda had her gun drawn. Although still recovering from his altercation with Gerson, Officer White also drew his weapon believing the incident would be a "shoot-out." Fortunately, the officers recognized that Gerson's gun was unloaded based on his continual racking of the gun. Gerson then went back inside his house.

33

b)    *Analysis*

To sustain a finding that Gerson made a criminal threat against Officer White in violation of section 422, the People had to show (1) Gerson willfully threatened to commit a crime that would result in death or great bodily injury to another person; (2) Gerson made the threat with the specific intent that the statement be taken as a threat, even if there was no intent of actually carrying it out; (3) on its face and under the circumstances in which it was made, the threat was so unequivocal, unconditional, immediate, and specific as to convey to Officer White a gravity of purpose and an immediate prospect of execution; (4) the threat caused Officer White to be in sustained fear for his safety; and (5) Officer White's fear was reasonable under the circumstances.  (§ 422, subd. (a); *In re George T.* (2004) 33 Cal.4th 620, 630.)

Gerson's sole challenge to his criminal threats conviction is the alleged lack of substantial evidence showing that Officer White experienced sustained fear.  Specifically, he claims that a person in Officer White's position would not reasonably be in sustained fear for his safety because Gerson weighed 142 pounds and Officer Bognuda weighed 189 pounds.  While he and Officer White were wrestling, Officer Bognuda hit him several times with her baton, including in the head.  At that time, additional officers were on their way, he would be arrested and would pose no future threat to Officer White.  We reject this argument because it ignores the circumstances in which he made the threats.

The statute imposes two requirements on the proof of a threat victim's fear.  First, there is a subjective component, that the threat actually caused sustained fear.  Second, the actual sustained fear must be objectively reasonable under the circumstances.  (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1139-1140.)  Courts have defined the term "sustained fear" as a period

of fear "that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) "[A]ll of the surrounding circumstances should be taken into account to determine if a threat falls within the proscription of section 422. This includes the defendant's mannerisms, affect, and actions involved in making the threat as well as subsequent actions taken by the defendant." (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013.) Whether the threat caused the victim sustained fear and whether the actual sustained fear was objectively reasonable are factual questions for the jury to resolve. (See *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1339.) If substantial evidence supports the jury's implicit findings, an appellate court should "not substitute its evaluation of a witness's credibility for that of the fact-finder." (*Ibid.*)

The evidence supports the jury's implied conclusion that Gerson's threats caused Officer White to suffer sustained fear. When the officers first contacted Gerson he appeared to be under the influence of a controlled substance, he refused Officer White's commands, and then physically resisted the officers. Officer White tackled Gerson after Gerson hit Officer Bognuda in the face, causing the men to fall. Gerson then placed Officer White in a chokehold. As Gerson choked him, Officer White expressed fear that he would be rendered unconscious and seriously injured.

After Officer Bognuda struck Gerson in the head with her baton, Gerson finally released Officer White. As Officer White gasped for breath, Gerson threatened to "kill" and "murder" him. When Gerson made these threats Officer White expressed concern for his safety thinking that Gerson might come after him with more force as he tried to catch his breath. Gerson then did exactly what Officer White feared.

35

Less than three minutes after making his threats, Gerson came outside with a semiautomatic handgun and attempted to rack a bullet into the chamber. The argument that Officer White did not experience sustained fear because Officer Bognuda was with him and other officers were on the way is incredible given the totality of the circumstances. This record also supports a conclusion that Officer White's fear was objectively reasonable under the circumstances. Based on the totality of the circumstances, substantial evidence supports the jury's implied finding that Officer White was reasonably in sustained fear for his safety. (§ 422, subd. (a).)

2. The Evidence Supported the Assault on Peace Officer Convictions

a) *Additional Background*

SWAT Officers Justin Tennebaum and Brandon Gibson positioned themselves on the roof of a neighbor's home. In the meantime, Gerson had gone back inside his house to a room where he ingested mushrooms, inhaled nitrous oxide, and chanted. The two officers watched the window of Gerson's home where Gerson was located. The window was open about six to eight inches. Officer Tennebaum could hear noises coming from the room and a male voice chanting or singing.

At some point, Gerson fired a shot from the room. Officer Gibson testified that Gerson had his gun pointed toward him and his partner. Officer Gibson then saw the vertical blinds on the window part and believed Gerson intended to fire more shots. A gunfight ensued as the sniper officers began shooting towards the window while Gerson fired back. Based on the muzzle flashes from Gerson's gun, both officers believed that Gerson had his gun pointed at them. Officer Tennebaum was one hundred percent certain that he and his partner were being shot at and feared for both of their lives.

Gerson fired all eight rounds from his handgun  The two SWAT officers fired approximately 48 shots.

A police criminalist testified that the weapon Gerson fired at the officers ejects expended shell casings a distance of seven to 14 feet to the right and over the shooter's right shoulder.  Police found eight expended shell casings in the room where Gerson was located.  The criminalist analyzed the trajectory of the bullets that Gerson fired.  Four bullets hit the neighboring house where the two SWAT officers were positioned, two shots hit the fence between the two houses, and there was no information for the remaining two shots.  The police criminalist believed that these two shots went over the roof where the officers were located.

The four bullets that hit the neighbor's home landed over twenty feet away from Officer Gibson's location.  The police criminalist did not know Gerson's location inside the room when Gerson fired his gun.  The shell casings from Gerson's gun were found in the back corner of the room.  The police criminalist concluded that Gerson was in a place where the two SWAT officers could not shoot him.

Gerson hired a criminalist who specializes in firearms-related matters and crime scene re-creation.  The defense criminalist agreed with the police criminalist's conclusion that Gerson had positioned himself in the back corner of the room based on the trajectories of the bullets going into and out of the room and the location of the expended shell casings.  The defense criminalist opined that a person standing near the window and the wall containing the window, particularly anyone looking through the blinds on the window, would have been hit by incoming bullets.

The defense criminalist opined that it was impossible for Officer Tennebaum to have seen a muzzle flash coming directly at him from the

room.  Nor did Officer Gibson see a muzzle flash.  The defense criminalist noted that the room had a mirror that would have reflected the muzzle flashes of a gun discharged in the room.  He believed that the SWAT officers saw the movement of the blinds on the window and the reflection of a muzzle blast off the mirror in the room.  Based on his re-creation and the location of the shots fired by Gerson, the defense criminalist did not believe Gerson could have shot either SWAT officer.

b)      *Analysis*

Citing *People v. Chance* (2008) 44 Cal.4th 1164 (*Chance*), Gerson contends that his convictions for assault on a peace officer with a semiautomatic weapon must be reversed because the record does not contain substantial evidence showing that he had the present ability to commit a violent injury on the two SWAT officers.  He asserts that the evidence shows he fired his gun from a position inside the house in which it was impossible for him to harm the officers.  Thus, at the time he fired the shots, he had no ability to injure them.

To sustain a conviction for assaulting a peace officer with a semiautomatic firearm, the prosecution had to prove, among other things, that "[w]hen [Gerson] acted, he had the present ability to apply force with a semiautomatic firearm to a person."  (§ 245, subd. (d)(2); CALCRIM No. 860.)  Section 240 provides:  "An assault is an unlawful attempt, *coupled with a present ability*, to commit a violent injury on the person of another."  (Italics added.)

In *Chance*, *supra*, 44 Cal.4th 1164, the Supreme Court considered the actus reus required for assault, specifically, what is required for a defendant to have the " 'present ability' to inflict injury" necessary to prove an assault under section 240.  (*Chance*, at pp. 1167, 1171.)  The court concluded that the

38

defendant in *Chance* had the present ability to inflict injury on a police officer even though the defendant pointed his gun in the wrong direction (incorrectly believing the officer was in front of him, although the officer had moved behind him), the defendant could not fire his gun until he moved a new round into the firing chamber, and the officer would have shot the defendant first if he had changed direction. (*Id.* at pp. 1168-1169, 1173, 1176.)

The *Chance* court explained that the "present ability" element "is satisfied when 'a defendant has attained the means and location to strike immediately.' [Citations.] In this context, however, 'immediately' does not mean 'instantaneously.' It simply means that the defendant must have the ability to inflict injury on the present occasion. Numerous California cases establish that an assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that injury would not be 'immediate,' in the strictest sense of that term." (*Chance, supra*, 44 Cal.4th at p. 1168, fn. omitted.) "[W]hen a defendant equips and positions himself to carry out a battery, he has the 'present ability' required by section 240 if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Id.* at p. 1172.)

Contrary to Gerson's assertion, the evidence adequately establishes that the two SWAT officers were within his firing range. Gerson fired eight rounds through the window and in the direction of the two officers. Four of Gerson's shots hit the house where the officers were located. Both officers believed that Gerson's actions endangered their lives. Gerson's position in the back of the room provided him the means and location to strike immediately; thus, he had the present ability to injure. (*Chance, supra*, 44

Cal.4th at p. 1174.) That external circumstances may have doomed his assault to failure did not negate his present ability to commit an assault. (*Ibid.* [An intended victim's " 'effective steps to avoid injury has never been held to negate this "present ability." ' "]; see also *People v. Raviart* (2001) 93 Cal.App.4th 258, 267 ["[T]he fact that [the target] may have been sheltered, in whole or in part, by [a] building did not preclude [a] jury from finding defendant had the present ability to injure him."]; *People v. Valdez* (1985) 175 Cal.App.3d 103, 106, 112 [affirming assault conviction for defendant who fired a gun at a gas station attendant sheltered behind a bulletproof window].)

In sum, substantial evidence supports the jury's finding that Gerson was guilty of assault with a semiautomatic weapon.

## IV. ALLEGED VIOLATION OF SECTION 654

### A. *Additional Background*

The jury found Gerson guilty of a series of crimes directed toward Officer White, including: assault by means of force likely to produce great bodily injury for placing Officer White in a chokehold (count 6); threatening to kill or murder Officer White after releasing him from the chokehold (count 7); exhibiting a firearm to resist arrest when he exited his house with an unloaded gun that he attempted to rack several times (count 8); and resisting Officer White using force or violence by placing Officer White in a chokehold (count 10). The trial court stayed the sentence on count 10 and imposed consecutive terms of one year and four months on count 6, eight months on count 7 and one year on count 8.

### B. *Analysis*

Gerson contends that his sentences on counts 7 (criminal threats) and 8 (exhibiting a firearm) must be stayed under section 654 because his objective

for these counts and counts 6 (assault likely to produce great bodily injury) and 10 (resisting an officer using force) was to prevent the officers from arresting him. To that end, he assaulted and threatened Officer White, exhibited a firearm, and resisted Officer White. He argues that the trial court correctly stayed sentence on the resisting count but that it erred when it failed to stay counts 7 and 8 for making a criminal threat and exhibiting a firearm. The People contend that while Gerson's grand scheme may have been to avoid arrest, counts 7 and 8 are based on separate acts and entailed sufficiently separate intents and objectives. We agree with the People.

Section 654 is intended to ensure that the defendant is punished commensurate with his or her culpability. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) The defendant's intent and objective, not the temporal proximity of his or her offenses, determines whether multiple punishment is permissible. (*Ibid.*) When section 654 prohibits multiple punishments, the trial court must stay execution of sentence on the convictions that implicate multiple punishments. (*People v. Correa* (2012) 54 Cal.4th 331, 337.)

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. [Citations.] We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives. [Citations.] At step one, courts examine the facts of the case to determine whether multiple convictions are based upon a single physical

41

act. [Citation.] When those facts are undisputed . . . the application of section 654 raises a question of law we review de novo." (*People v. Corpening* (2016) 2 Cal.5th 307, 311-312 (*Corpening*).)

" ' "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses not for more than one." [Citation.]' [Citation.] If the court makes no express findings on the issue, as happened here, a finding that the crimes were divisible is implicit in the judgment and must be upheld if supported by substantial evidence. [Citation.] Thus, '[w]e review the trial court's findings "in a light most favorable to the respondent and presume in support of the order the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717 (*Lopez*).)

"We first consider if the different crimes were completed by a 'single physical act.' " (*Corpening, supra*, 2 Cal.5th at p. 311.) Gerson and the People agree that the assault, criminal threats, and exhibiting a firearm counts constituted separate acts. We concur that this case involves a course of conduct, rather than a single physical act. We next "consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives." (*Ibid.*) "Under section 654, a course of conduct divisible in time, though directed to one objective, may give rise to multiple convictions and multiple punishment 'where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.' " (*Lopez, supra*, 198 Cal.App.4th at pp. 717-718.)

The trial court impliedly found that Gerson's course of conduct reflected multiple intents and objectives. The record supports this determination.

Count 6 pertained to Gerson's assault on Officer White, including putting him in a chokehold. The assault ended when Officer Bognuda hit Gerson in the head with her baton, which caused Gerson to immediately release his chokehold on Officer White. After releasing his chokehold, Gerson committed count 7 when he threatened to kill and murder Officer White. Gerson then retreated into his house only to come back outside with a handgun to presumably implement his threats and commit count 8. This evidence supports findings of separate intents and objectives and does not compel a conclusion there was an indivisible course of conduct, or that Gerson's offenses were committed as a means of facilitating the single objective of avoiding arrest.

Even if Gerson committed the crimes with the same intent or objective, the trial court's implied finding can be affirmed on the alternative basis that Gerson had adequate time to reflect on his actions. The evidence allows a reasonable deduction that Gerson's offenses were " 'temporally separated in such a way as to afford [him the] opportunity to reflect and renew his [ ] intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.' " (*Lopez, supra*, 198 Cal.App.4th at pp. 717-718.)

We therefore conclude that substantial evidence supported multiple punishment for Gerson's separate acts of threatening Officer White's life and exhibiting a firearm to Officer White. Thus, the trial court did not err by its implied finding that section 654 did not apply to counts 7 and 8.

43

## V.  GERSON IS ENTITLED TO CUSTODY OR CONDUCT CREDITS FOR THE TIME HE SPENT RELEASED ON BAIL

A.  *Additional Background*

The trial court set Gerson's bail at $2 million on the condition that he wear a GPS monitoring device and be admitted to a locked hospital unit for treatment and evaluation.  Gerson was then treated at Alvarado.  While there, he was not allowed to leave the premises and wore a GPS device.  After the trial court modified Gerson's bail conditions, he transferred from Alvarado to Casa Palmera.  The court required Gerson to wear a GPS monitoring device and subjected him to a Fourth Amendment waiver.  Gerson was then discharged to home detention with a GPS device and subject to other conditions.  Gerson's home detention lasted from August 4, 2017, to April 4, 2019.[17]

Prior to sentencing, Gerson sought custody and conduct credits for the time he spent at Alvarado and Casa Palmera, and his time on home detention while out on bail.  The prosecutor agreed that Gerson was entitled to custody and conduct credit for his time at Alvarado and Casa Palmera.  The trial court awarded Gerson custody credits for those days but concluded that he was not entitled to credit for his time at home on bail finding that home

---

[17]    While on home detention, the trial court reduced Gerson's bail to $1 million and his conditions changed over time.  Initially, the court allowed him 90 minutes per day to do personal errands but required that he be accompanied by a responsible adult.  The court then ordered him to surrender his passport, remain on GPS monitoring, abstain from alcohol, regularly drug test, and attend psychological counseling.  Eventually, the court allowed him to work between 7 a.m. and 6 p.m.  He was later allowed to work until 8:30 p.m. on Wednesdays and spend three nights a week at his girlfriend's home.  He remained subject to a curfew, wore a GPS device and was subject to a Fourth Amendment waiver.

detention was not a "custodial environment" similar to county jail, Alvarado, or Casa Palmera.

B.     *Custody Credits*

Preconviction custody credits are governed by section 2900.5, subdivision (a), which provides in relevant part that "[i]n all felony and misdemeanor convictions, either by plea or by verdict, . . . all days of custody of the defendant, including . . . days served in home detention pursuant to Section 1203.016 or 1203.018, shall be credited upon his or her term of imprisonment. . . ." Section 1203.016 governs home detention postsentencing and section 1203.018 extends the same conditions and privileges to a home detention program prior to sentencing. (*People v. Yanez* (2019) 42 Cal.App.5th 91, 93-94 (*Yanez*).) The conditions of electronic home detention under sections 1203.016 and 1203.018 are "substantially similar." (*Yanez*, at p. 94.) Under the version of section 1203.018 in effect when Gerson was sentenced, "the board of supervisors of any county" may "offer a program under which inmates *being held in lieu of bail in a county jail* or other county correctional facility may participate in an electronic monitoring program" if specified statutory conditions are met. (*Id.*, subds. (a) & (b), italics added.)

Section 1203.018 leaves the terms of the electronic monitoring program to the discretion of county authorities, but provides that the rules and regulations of the program must require that the participant "remain within the interior premises of his or her residence during the hours designated by the correctional administrator" and "admit any person or agent designated by the correctional administrator into his or her residence at any time for purposes of verifying the participant's compliance with the conditions of his or her detention." (Former § 1203.018, subds. (d)(1) & (d)(2).) The statute allows for the use of "global positioning system devices or other supervising

45

devices for the purpose of helping to verify the participant's compliance with the rules and regulations of the electronic monitoring program." (Former § 1203.018, subd. (d)(3).)[18]

The plain language of section 2900.5 provides that Gerson may receive custody credit for periods in home detention prior to sentencing only if the home detention complies with section 1203.018. Gerson candidly admits that the record does not support a conclusion that he was on a home detention program within the meaning of section 1203.018. Instead, Gerson argues entitlement to additional preconviction custody credits under *People v. Lapaille* (1993) 15 Cal.App.4th 1159 (*Lapaille*). Assuming we reject this argument, he asserts that awarding preconviction custody credits to persons who participate in electronic monitoring programs pursuant to section 1203.018, while denying preconviction custody credits to persons such as himself, subject to electronic monitoring on home detention while on bail, violates his right to equal protection.

We find that *Lapaille*, *supra*, 15 Cal.App.4th 1159 is of limited value to Gerson because it was decided *before* the enactment of section 1203.018, at a time when electronic home detention was available only to *sentenced* inmates, under the conditions of section 1203.016. (*Lapaille*, at p. 1165.) Section 1203.018 now extends the same conditions and privileges to pretrial custody. As Gerson admitted, however, he was not on a home detention program within the meaning of section 1203.018.

Turning to Gerson's alternative argument, he notes that persons who participate in electronic monitoring programs pursuant to section 1203.018

---

[18] The current version of section 1203.018 is substantively similar to the former version.

46

are entitled to preconviction custody credits, while persons on home detention and subject to electronic monitoring while on bail, such as himself, are not. In other words, Gerson argues that he is similarly situated to a person participating in an electronic monitoring program pursuant to section 1203.018 and thus should be entitled to preconviction custody credits on equal protection grounds. We agree.

"Equal protection requires the state to treat similarly situated persons alike, with some exceptions in which the disparate treatment is sufficiently related to the purpose of the [law] in question." (*People v. Jacobs* (1992) 6 Cal.App.4th 101, 103.) The similarly situated inquiry examines whether two groups are similarly situated for purposes of the law challenged, not whether they are similarly situated for all purposes. (*People v. McKee* (2010) 47 Cal.4th 1172, 1202 (*McKee*).) The threshold question is "whether two classes that are different in some respects are sufficiently similar with respect to the laws in question to require the government to justify its differential treatment of these classes under those laws." (*Ibid.*) "If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold." (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155.)

To show that persons such as himself who are out on bail and subject to electronic monitoring are similarly situated to persons participating in an electronic monitoring program pursuant to section 1203.018, Gerson must establish that the terms of his release were as "custodial, or restraining" as a statutory home detention program pursuant to section 1203.018. (See *Lapaille, supra,* 15 Cal.App.4th at pp. 1163, 1169 ["[I]n order to compare persons confined to their homes under electronic surveillance, and thus eligible for home detention program credit pursuant to current section 2900.5, subdivision (a), with defendant, who was confined to preconviction

47

house arrest as a condition of [his release on his own recognizance], for purposes of applying the equal protection clauses, we must determine whether his confinement to his home was as custodial, or restraining, as are those confined subject to electronic tracking."].)

Subdivision (d) of former section 1203.018 provides that participants in a home detention program must comply with the rules of the program, including the following: (1) remaining within the interior premises of his or her residence during the hours designated by the correctional administrator; (2) admitting persons into his or her residence at any time for purposes of verifying compliance with the conditions of his or her detention; and (3) a GPS device or other supervising device. Here, the record shows that Gerson was required to remain in his home during the hours designated by the court, wear a GPS device, and was subject to a Fourth Amendment waiver. Because Gerson's home detention satisfied the statutory requirements, we conclude that the terms of his release were at least as "custodial, or restraining" as a statutory home detention program pursuant to section 1203.018. (See *Lapaille*, *supra*, 15 Cal.App.4th at pp. 1163, 1169.) Thus, Gerson is similarly situated to persons participating in an electronic monitoring program pursuant to section 1203.018, yet he is being treated differently.[19]

---

19     We reject the People's argument that Gerson is not similarly situated to defendants on home detention under section 1203.018 because he posted bail and defendants on home detention under 1203.018 did not. As Gerson aptly notes, entitlement to custody credits under section 2900.5 is related to a defendant's days in custody and not whether a defendant posted bail. (§ 2900.5, subd. (a); *McKee*, *supra*, 47 Cal.4th at p. 1202 [two groups must be similarly situated for purposes of the law challenged, not for all purposes].)

Once it is determined that two groups are similarly situated for the purposes of a statute, we then ask whether disparate treatment of the groups is justified. (*McKee, supra*, 47 Cal.4th at p. 1207.) Where, as here, the legislative classification does not reach a suspect class or fundamental right, the classification does not violate equal protection if it bears a rational relationship to a legitimate public purpose. (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1200-1201, overruled on another ground in *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 888.)

Under this standard, "equal protection of the law is denied only where there is no 'rational relationship between the disparity of treatment and some legitimate governmental purpose.'" (*People v. Turnage* (2012) 55 Cal.4th 62, 74.) "In other words, the legislation survives constitutional scrutiny as long as there is ' "any reasonably conceivable state of facts that could provide a rational basis for the classification." ' [Citation.] This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] While the realities of the subject matter cannot be completely ignored [citation], a court may engage in ' "rational speculation" ' as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review 'whether or not' any such speculation has 'a foundation in the record.'" (*Id.* at pp. 74-75.)

The People have not attempted to justify treating individuals such as Gerson released on bail and ordered by a court to home detention with electronic monitoring different from individuals participating in an electronic monitoring program pursuant to section 1203.018. Even speculating, we cannot discern a rational basis for treating an individual, such as Gerson, who is out on bail and subject to electronic monitoring different from an

49

individual participating in an electronic monitoring program pursuant to section 1203.018. Both categories of individuals are subjected to similarly restrictive home detention conditions and both are avoiding spending time in jail or other local custody.

Denying a defendant preconviction custody credit for days spent subject to electronic monitoring on "home detention based on the manner in which he or she came to participate in the program would elevate form over substance; the focus is properly on whether *the placement* met certain custodial conditions and standards, not the procedure by which the defendant was placed." (*People v. Raygoza* (2016) 2 Cal.App.5th 593, 601, italics added.) If the defendant's custody conditions satisfy the statutory minimum conditions, there is no basis to deny credit to the defendant while granting it to others subject to similar custody conditions. As the *Raygoza* court observed in a footnote that cited *Lapaille*, *supra*, 15 Cal.App.4th 1159, "A statute that precludes similarly detained defendants from receiving similar custody credit raises serious constitutional concerns." (*Raygoza*, at p. 602, fn. 4.)

Accordingly, we hold that Gerson is entitled to 608 days of custody credit for preconviction custody pursuant to section 2900.5, subdivision (a) under the state and federal equal protection clauses.

C.     *Conduct Credits*

Gerson also contends that he is entitled to additional conduct credit under section 4019 for his time on home detention. In addition to actual custody credit under section 2900.5, "section 4019 . . . offer[s] prisoners in local custody the opportunity to earn 'conduct credit' against their sentences for good behavior." (*People v. Brown* (2012) 54 Cal.4th 314, 317, fn. omitted.) Section 4019 applies in various circumstances, including "[w]hen a prisoner participates in a program pursuant to Section 1203.016 . . . ." (§ 4019, subd.

50

(a)(7).) Although section 4019 expressly authorizes conduct credit for defendants participating in a postsentencing electronic home detention program under section 1203.016, section 4019 does not expressly address defendants participating in a presentencing electronic home detention program under section 1203.018.

In *Yanez*, the appellate court held that, because defendants are statutorily eligible for conduct credit if they are placed on electronic home detention *after* imposition of sentence (see §§ 1203.016, 4019, subd. (a)(7)), it violates equal protection to deny eligibility for conduct credit for time spent on electronic home detention *prior* to sentencing (see § 1203.018). (*Yanez, supra*, 42 Cal.App.5th at p. 93.) Gerson argues that because he has shown entitlement to custody credits under the equal protection clause even though he was not on a home detention program under section 1203.018, he is similarly entitled to conduct credits under *Yanez*, even though he was not on a home detention program under section 1203.018.

As we discussed, Gerson has shown entitlement to custody credits under the equal protection clause. Accordingly, under *Yanez, supra*, 42 Cal.App.5th 91, to the extent Gerson is entitled to receive preconviction section 2900.5 custody credits, he is also entitled to 91 days of preconviction section 4019 conduct credit for his time spent in preconviction home detention as a matter of equal protection. (*Yanez*, at p. 100.)

## VI.    MOTION TO RECALL THE REMITTITUR

A.    *Recalling the Remittitur Is Appropriate Under the Circumstances*

In 2019, the trial court sentenced Gerson to a total term of 33 years eight months in prison. As part of that sentence, the trial court imposed the middle term on Counts 3 and 4 (assaulting two peace officers with a semiautomatic firearm). While this appeal was pending, Assembly Bill 124

51

amended section 1170 to require the sentencing court to impose a lower term where trauma experienced by the defendant contributed to the offense and the court concludes aggravating circumstances did not outweigh mitigating circumstances.  Gerson contends he suffered physical trauma as a result of being hit by a baton multiple times and this trauma was "a contributing factor in the commission" of the assaults.

Gerson now seeks to recall the remittitur issued on April 26, 2022, claiming ineffective assistance of appellate counsel in failing to file a supplemental brief or a petition for rehearing requesting a remand for resentencing based on Assembly Bill 124.  Gerson argues because physical trauma contributed to the assault, and it would not be "contrary to the interest of justice" to impose the lower term, the court was required to impose the lower term of five years, instead of the seven years the court imposed at sentencing on Count 3, the principal term.

The People oppose the motion, arguing that the proper route to obtain relief on Gerson's ineffective assistance of counsel claim is through a petition for writ of habeas corpus, not the "obscure and constrained method of moving for recall of the remittitur."  The People also contend that Assembly Bill 124 does not benefit Gerson because the trial court already considered Gerson's mental health at the sentencing hearing, thus counsel was not ineffective for failing to subsequently raise the issue.

We agree that Gerson could have filed a petition for a writ of habeas corpus to raise his claim of ineffective assistance of counsel, but we disagree that this was the only remedy available to him.  For good cause, a remittitur may be recalled (Cal. Rules of Court, rule 8.272(c)(2)) and, other than to correct clerical errors, a remittitur may be recalled "on the ground of fraud, mistake, or *inadvertence*."  (*Pacific Legal Foundation v. California Coastal*

*Com.* (1982) 33 Cal.3d 158, 165, italics added.)  As our high court noted in *People v. Mutch* (1971) 4 Cal.3d 389, a remittitur may be recalled when an error of law "is of such dimensions as to entitle the defendant to a writ of habeas corpus." (*Id.* at p. 396.)  Likewise in *People v. Rhoden* (1972) 6 Cal.3d 519, 521, 529, on an application to recall the remittitur, the California Supreme Court held that the petitioner was denied his right to effective counsel on appeal and transferred the matter to the appellate court with directions to recall its remittitur, vacate its decision, and reinstate the appeal.

In *People v. Lewis* (2006) 139 Cal.App.4th 874, the court recalled the remittitur and vacated the opinion where the basis for affirming the conviction was later abrogated by the California Supreme Court.  (*Id.* at p. 879.)  Similarly, in *People v. Valenzuela* (1985) 175 Cal.App.3d 381, the appellate court granted a motion to recall the remittitur on the ground defendant was deprived of effective assistance of appellate counsel.  (*Id.* at p. 394.)  And, in *People v. Phung* (2018) 25 Cal.App.5th 741, the appellate court recalled a remittitur on the ground that appellate counsel had provided ineffective assistance of counsel in failing to raise the retroactivity of Proposition 57 to his case.  (*Phung*, at p. 747.)  The circumstances here are similar to those in *Valenzuela* and *Phung*.

In arguing against recalling the remittitur, the People cited *In re Richardson* (2011) 196 Cal.App.4th 647, which addressed a habeas petition alleging, among other things, that petitioner suffered ineffective assistance of counsel when his appellate counsel failed to seek recall of the remittitur after the California Supreme Court issued an opinion that changed the law on an issue.  (*Id.* at p. 656.)  In *Richardson*, however, the appellate court issued its opinion affirming the judgment in August 2006, issued its remittitur on

December 4, 2006, and a week later, the Supreme Court on December 11, 2006, issued an opinion that cast a shadow on one of the appellate court's rulings. (*Id.* at p. 654.) Thus, the change in the law occurred *after* the opinion was final and did not result from ineffective assistance of counsel in failing to raise the issue. (*Id.* at pp. 664-665.) *Richardson* is distinguishable.

The next question is whether Gerson's appellate counsel provided ineffective assistance to warrant the remedy of recalling the remittitur. " '[T]o demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833; *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

To determine whether appellate counsel's failure to raise an argument under Assembly Bill 124 "fell below an objective standard of reasonableness,

54

and if so, whether the failure resulted in prejudice, we must assess the merits of that claim." (*In re Hampton* (2020) 48 Cal.App.5th 463, 478 (*Hampton*).)

The Governor signed Assembly Bill 124 on October 8, 2021. This was after the appeal had been fully briefed and during the period when we reviewed the matter prior to oral argument. During this time appellate counsel could have requested permission to file a supplemental opening brief asking this court to remand Gerson's case for a new sentencing hearing under Assembly Bill 124. (See Cal. Rules of Court, rule 8.200(a)(4).) Alternatively, after we issued the opinion on January 22, 2022, appellate counsel could have included an issue related to Assembly Bill 124 in the petition for rehearing he filed on February 14, 2022, but did not do so. In a declaration Gerson's counsel filed in support of the motion to recall the remittitur, he admitted that he was not aware that Assembly Bill 124 might apply to Gerson and that he had no tactical reason for failing to raise an issue based on Assembly Bill 124. (*Hampton, supra,* 48 Cal.App.5th at p. 477 ["where appellate counsel fails to raise 'a significant and obvious issue,' the failure will generally be considered deficient performance under *Strickland, supra,* 466 U.S. 668"].)

The People do not challenge Gerson's argument that it was objectively unreasonable for his appellate counsel to fail to file a supplemental brief addressing Assembly Bill 124, or a petition for rehearing requesting remand for resentencing under Assembly Bill 124. Rather, the People contend Gerson's appellate counsel cannot establish he was ineffective for failing to raise Assembly Bill 124 because Gerson suffered no prejudice in that the result would not be different under Assembly Bill 124. Specifically, the People assert that a remand is unnecessary because the trial court considered Gerson's alleged mental health disorder when sentencing him and the result

would have been the same had Assembly Bill 124 been in effect at the time of sentencing. As we shall explain, we disagree.

B. *Gerson Is Entitled to Resentencing Under Assembly Bill 124*

The Governor signed Assembly Bill 124 while this appeal was pending, and it became effective on January 1, 2022. (Stats. 2021, ch. 695, § 5.3.) Assembly Bill 124 applies retroactively to nonfinal cases on direct appeal. (*Banner, supra,* 77 Cal.App.5th at p. 240); *People v. Vieira* (2005) 35 Cal.4th 264, 305-306 [a judgment becomes final when the time for petitioning for a writ of certiorari in the United States Supreme Court has passed]; see U.S. Supreme Ct. Rule 13(1) [providing ninety days from the date of the entry of the final judgment in the highest state appellate court to petition the Supreme Court for a writ of certiorari].)

Assembly Bill 124 made a low-term sentence presumptively appropriate under specified circumstances, including where the defendant's experience of psychological or physical trauma was a "contributing factor" to the defendant's commission of the offense. (§ 1170, subd. (b)(6)(A).) Where the presumption applies, the trial court may impose a higher sentence if it finds "the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice." (§ 1170, subd. (b)(6).) Even where the presumption does not apply because there is no evidence that the circumstances listed in paragraph (6) are present, the trial court retains discretion to impose the lower term. (§ 1170, subd. (b)(7).)

Remand for resentencing is required in this case "unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) This is because defendants are

" 'entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.' " (*Ibid.*)  A court that is not aware of the scope of its discretionary powers cannot exercise that "informed discretion" any more than a court whose sentence may have been based on misinformation regarding a material aspect of the defendant's record.  (*Ibid.*)

We reject the People's assertion that the record clearly indicates the trial court would have imposed the same sentence had Assembly Bill 124 been in effect at the time of sentencing.  The probation report, prepared in July 2019, well before the language of Assembly Bill 124 was introduced on December 18, 2020, notes that Gerson has diagnosed mental disorders and suffered a traumatic brain injury during the incident.  However, at the time of Gerson's sentencing in 2019, the trial court had no statutory reason to make, and Gerson had no reason to seek, a finding that past psychological or physical trauma was a contributing factor to his commission of any of his offenses.  (§ 1170, subd. (b)(6)(A).)  "[P]sychological trauma based on mental illness may be a circumstance qualifying for the lower term presumption in section 1170, subdivision (b)(6)." (*Banner*, *supra*, 77 Cal.App.5th at p. 241.)[20] Additionally, even if the trial court were to find no evidence that the circumstances listed in paragraph (6) are present, it nonetheless retains discretion to impose the lower term.  (§ 1170, subd. (b)(7).)

---

[20]    We also reject the People's argument that a remand would be futile because Gerson's probation report listed three aggravating circumstances and only one mitigating circumstance.  Subdivision (b)(6) of section 1170 requires that "the aggravating circumstances outweigh the mitigating circumstances" but also that "imposition of the lower term would be contrary to the interests of justice."  The parties did not argue this point and the trial court was not called upon to make such a finding during Gerson's 2019 sentencing hearing.

Accordingly, Gerson's sentence is vacated. On remand, the trial court may fully resentence Gerson anew, incorporating the new legislative changes. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893; *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["[T]he full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant."].) We express no view as to how the trial court should exercise its discretion on remand.

DISPOSITION

We direct the trial court to award Gerson 608 additional days of preconviction custody credit (§ 2900.5, subd. (a)) and 91 additional days of preconviction conduct credit (§ 4019). Gerson's sentence is vacated and the matter is remanded for resentencing under Assembly Bill 124. After resentencing, the clerk of the superior court is directed to amend the abstract of judgment accordingly and forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

Upon issuance of the remittitur, the clerk is directed to forward a copy of this opinion and the order granting Gerson's request to recall the remittitur to the State Bar of California. (Bus. & Prof. Code, § 6086.7, subd. (a)(2).)

HALLER, Acting P. J.

WE CONCUR:

DATO, J.

DO, J.